# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### SPRINGFIELD

TYRNEL ENTERPRISES, INC.,      )
      Plaintiff              )
                             )
v.                           )       **Civil Action No. 05-30172-MAP**
                             )
FLEMING INDUSTRIES, INC., d/b/a    )
Iron Duck                    )
      Defendant

## DEFENDANT'S OPPOSITION TO THE PLAINTIFF'S MOTION TO COMPEL AND ALTERNATIVE MOTION FOR A PROTECTIVE ORDER

### STATEMENT OF THE CASE

The Defendant Fleming Industries is a Massachusetts corporation located in Chicopee, Massachusetts and does business, relevant to the instant case, through a division called "Iron Duck".  (Fleming)  Fleming is a privately held corporation in the business of the manufacture and sale of products for the use in the public safety industry. (Exhibit 1 Deposition of Brooke Lawrence P. 9, L. 8-10) Fleming has been in existence since 1976 (Exhibit 1, P.6, L. 24 to P.7, L2).  Two of the products sold by Fleming are backboards used by emergency medical personnel and restraint or stabilization/immobilization systems for use with the backboards to immobilize a patient's body.  Fleming has selling those products throughout its history and for years prior to the meeting with Martin Tyrrell alleged in the Plaintiff's Complaint, which occurred on March 29, 2000. (Amended Complaint, ¶ 9; Exhibit 1 P. 31, L14 to P.33, L.15 and throughout).

The issues involved in the instant case began with the meeting that occurred on March 29, 2000 involving Mr. Brooke Lawrence, the current Vice President of Sales for Fleming, and a man named Martin Tyrrell, who is alleged to be an inventor of the patent described in the Plaintiff's Complaint and a principal of the Plaintiff Tyrnel Enterprises, Inc. (Tyrnel). At the meeting, following a discussion between Mr. Lawrence and Mr. Tyrrell, a confidential disclosure agreement, provided by Mr. Tyrrell, was signed by both parties. (Exhibit 2, Confidential Disclosure Agreement March 29, 2000 marked as Exhibit 2 to the Brooke Lawrence deposition; *see* Exhibit 1 P 37, L11 to P 49 L 16). As a consequence of that meeting, Fleming proceeded to produce a limited number of samples of the head restraint system that Mr. Tyrrell demonstrated to Mr. Lawrence. At that time, there had been no patent application filed by Mr. Tyrrell relative to the head restraint system, or any other aspect of the patent alleged in the Plaintiff's Amended Complaint, and in fact in paragraph 11 of the Plaintiff's Amended Complaint the Plaintiff affirmatively alleges that a patent application was not filed until July 9, 2001.[1]

After including the head restraint and immobilization system in its catalogue for period of time, there were no requests from Fleming distributors, or the customers of Fleming's distributors for the product. (Exhibit 1 P. 76, L 10-L17; P 78, L22-or 2 P. 80 L. 17) Matters stood without any communication between the parties until over two and half years later when Mr. Tyrrell sent an e-mail to Fleming (Exhibit 3 October 19, 2002 e-mail from Martin Tyrrell to Brooke A. Lawrence marked as Exhibit 3 to the Brooke Lawrence deposition) As can be seen in

---

[1] It should be noted that 35 U. S. C. S. § 102 (b) states "a person shall be entitled to a patent **unless**-…the invention was patented or described in printed publication in this or a foreign country or in public use or on ale in this country, more than one (1) year prior to the date of the application for patent in the United States, …". (emphasis supplied) In this matter, Mr. Tyrrell affirmatively agreed that the methodology to be employed to determine if Fleming and Mr. Tyrrell would enter into a business arrangement with respect to the head restraint-immobilization system, was for Fleming to produce samples, include the product in its line of products and to determine and gauge whether or not there was any market for the head restraint system. On that basis alone, the Plaintiff's alleged patent is invalid. Notwithstanding that fact, the result of the marketing effort by Fleming revealed that there was no market for the product no call for purchase of the product and thus even if the patent is valid, the Plaintiff's damage claim is moot.

that exhibit, Mr. Tyrrell very clearly describes that product or design that he demonstrated to Mr. Lawrence as "***a new head immobilization system***". (emphasis supplied)  In that e-mail Mr. Tyrrell, for the first time, alleges that he has a patent and then appears to attempt to expand the design or device that he demonstrated to Mr. Lawrence beyond the head immobilization system to include Ultra Vue Backboards.

Fleming does not dispute that Mr. Tyrrell did bring a head immobilization system with an innovation which related to the use of quick clips.  (Exhibit 1 references ***infra***)  As noted in the references ***infra*** in Mr. Lawrence's deposition, Fleming has been manufacturing and selling backboards for many years before ever hearing of Mr. Tyrrell, and did not make any changes to their backboards after meeting with Mr. Tyrrell, with the exception of creating a wider version of the backboard in one circumstance and in another circumstance a different configuration of the taper, none of which relates to any claim alleged by the Plaintiff in its Complaint. (Exhibit 1 P. 31 L. 3 to p. 42 L.19; P. 83 L.18 to P. 86 L. 20;P. 87 L. 22 to P. 88 L. 11; P. 88, L.18 to P. 90L. 16; P. 90 L. 23 to P. 93 L. 7; P. 93 L. 11 to P. 94 L. 15) Further, the Plaintiff itself markets itself as a producer of head restraint systems, not backboards. (***See*** Exhibit 4, Tyrnel Head Restraint System Brochure marked as Exhibit 12 to the Brooke Lawrence deposition) [2]

Despite the fact that the only legitimate claim of any product that was demonstrated to Fleming being the head restraint system using the quick clips instead of Velcro and other devices, and despite the fact that Mr. Tyrrell himself in his e-mail of October 19, 2002 very clearly describes what he brought and showed to Mr. Lawrence as being a head immobilization system, Mr. Tyrrell went and sought approval of a patent to include a long standing and well known product of Fleming and other manufacturers, a backboard, which very clearly pre-existed

---

[2] This exhibit also contradicts the representation in the Plaintiffs' motion that it is not a competitor of Fleming.  Tyrnel very clearly has created marketing tools to sell its product, which is not a product that Fleming sells nor is it similar to products that Fleming sells.  ***See*** Exhibit 1 P. 94, L. 18 to P. 95 L. 11.

in the market place for a substantial number of years prior to any action or inventiveness, if any, by Mr. Tyrrell.

In short, this attempt on the part of the Plaintiff, by making bald, unsupported and unsubstantiated allegations regarding alleged infringement with respect to a product that has been manufactured and sold by numerous manufacturers, including Fleming, for substantial periods of time before the advent of Mr. Tyrrell or the creation of Tyrnel, does not entitle the Plaintiff to the unfettered and unrestricted access to the confidential and proprietary materials and business records of the Defendant. The Defendant submits that it is incumbent upon the Plaintiff to make at least a minimal showing that it has some likelihood of prevailing on its claims with respect to products other than the head immobilization system using quick clips, which Fleming acknowledges was a device demonstrated to it by Mr. Tyrrell *in connection with head immobilization systems.* (emphasis supplied) [3] The Plaintiff's claims, with respect to products that Fleming has affirmatively demonstrated pre-existed, by substantial period of time, Mr. Tyrrell's presentation, and which were not modified in any way as a consequence of any involvement of Mr. Tyrrell, simply are not products that were the subject of the confidential disclosure agreement or which can properly be included as products in Mr. Tyrrell's patent. It defies logic to suggest that a party such as the Plaintiff in this case, can make such unsubstantiated allegations, and in the face of sworn testimony indicating that those allegations are untrue and false, force a private corporation or individual to disclose proprietary and confidential business information under the rubric of the rules of discovery.

---

[3] Quick clips had been used for years with immobilization devices used in connection with backboards for emergency medical use, and were incorporated into products sold by Fleming for use with its backboards to restrain the bodies or torsos of patients. The only difference with the Tyrrell device was the use of the quick clips to secure or immobilize the head of a patient.

## THE DISCOVERY REQUESTS AND RESPONSES

The Plaintiff, in Interrogatory No. 4, requests the identity of all suppliers to Fleming of backboards, neck stabilization systems and/or back stabilization systems and components thereof, and other information.  Fleming raised objections based on, among other things, relevancy as well as the confidentiality and the proprietary nature of the information sought.  Fleming responded that it manufactured its own backboards and straps, thus there are no "suppliers" as that word is used in the Interrogatory.  Fleming also notes that its foam products are made by a third party vendor to Fleming's specifications.  It should be noted that this Interrogatory is seeking information about back immobilization systems, goes beyond even the allegations of the Complaint, and has never been referenced *by Mr. Tyrrell* in any communication from him to Fleming.  To the extent that such systems are included in the so-called patent of the Plaintiff, the Defendant submits that those components are pure fictions of an attorney's imagination and have nothing to do with the interaction between Mr. Tyrrell, the Plaintiff and Fleming.  Fleming submits that the Answer is adequate, that the fact that Fleming does not sell and has no record of selling of the devices shown to it by Mr. Tyrrell, makes the request overbroad and irrelevant.  This request, as with the others, if restricted to requests regarding the Tyrrell device, would be proper, but the response would still be that Fleming produced samples, gave the samples to distributors, and perhaps to customers of distributors, and did not receive any orders for the device.[4]

Interrogatory No. 6 seeks all sales, price and costs information for five (5) years regarding backboards, neck stabilizations systems and back stabilizations systems.

---

[4] Fleming's objections also include claims of privilege which are not being waived by Fleming.  The Plaintiff's motion does not ask for disclosure of privileged material and thus no argument is made in that regard by Fleming.

Fleming objected on a number of basis including relevancy and confidentiality. This information is extremely sensitive and extremely confidential to Fleming and Tyrnel, which is very clearly a competitor of Fleming, has used a shotgun approach to garner information which, if received by the Plaintiff, could be extremely harmful and detrimental to Fleming's competitive position in the market and its business operations. Once again, Fleming submits to the Court that the only product that was presented or demonstrated by Mr. Tyrrell was a head restraint system with the use of quick clips. Nothing that Mr. Tyrrell presented to Fleming involved backboard design, backboard manufacturer, backboard modification or back stabilization systems. The mere allegations of the Amended Complaint, ***which is not a verified Complaint*** (emphasis supplied) and thus does not carry the weight of an Affidavit or sworn statement of the Plaintiff or its principals, cannot be a basis, in the face of sworn testimony that flatly denies and contradicts those allegations, upon which a company like Fleming can be forced to disclose such critical information to a competitor.

    In Interrogatory No. 7, the Plaintiff asked for Fleming's "marketing efforts", which the Defendant assumed meant with respect to the Plaintiff's alleged product. The response is clear, direct and complete. To the extent that the question is intended to discover general marketing done by the Defendant, the answer would remain essentially the same; that is, the use of catalogues, including a catalogue on the Defendant's website. The Defendant does not sell any products directly to customers, but makes use of distributors. The Defendant has provided that information to the Plaintiff in Mr. Lawrence's deposition.

Interrogatory No. 8 and Interrogatory No. 9 request gross sales of the Defendant whole business, and in No. 9, gross sales of its business with regard to backboards, neck stabilization systems and/or back stabilization systems, all for the period of five (5) years. As set forth above, the defendant objects in that this information is extremely confidential, private and given the frivolous and spurious nature of the Plaintiff's claims, not properly the subject of discovery unless and until the Plaintiff can make a reasonable showing that it has some likelihood of succeeding on its claims that it has some protected interest in products that have been manufactured and sold by the Defendant for numerous years before March 29, 2000 when Mr. Tyrrell unfortunately arrived at the Defendant's door.

Interrogatory No. 10 requests all communications that the Defendant has had with Mr. Tyrrell or the Plaintiff. The response is complete and the Plaintiff does not describe in what manner the response is incomplete, and does not address the issue in the memorandum in support of its Motion.

The Defendant's motion also seeks an order compelling further production of documents. Request No. 2, simply, and extremely broadly states that Fleming should "any and all documents related to Martin Tyrrell or Tyrnel Enterprises, Inc.". Despite objections for a variety of reasons, including the overbreadth of the request and the duplicative nature of the request, Fleming produced all documents within its possession, custody and control to the Plaintiff, and there are no further documents to be produced. It should also be noted that the Plaintiff's memorandum does not address Request No. 2 at all.

The Plaintiff's Motion does not address Request No. 4, but its memorandum does. This request seeks sales information regarding backboards, neck stabilization systems and/or back stabilization systems.  As noted previously, with respect to Interrogatory Answers, there is absolutely no evidence that the Plaintiff or its principal Mr. Tyrrell presented or demonstrated anything related to a new or improved backboard or a back stabilization system, and the only presentation related to a neck stabilization system that used quick clips.  As noted above, Fleming has sold backboards, neck stabilization systems and back stabilization systems for many, many years, long before the presentation of Mr. Tyrrell.  The Plaintiff has been advised in the Answers to Interrogatories and in the testimony of Mr. Lawrence, that there simply is no information regarding sales of the neck stabilization system which was described and presented by Mr. Tyrrell because there no sales.  To suggest that the Plaintiff, on the frivolous and unsupported allegations of the unverified Amended Complaint, should be entitled to wade through, have possession of and make use of confidential and proprietary sales and financial information of the Defendant, without some minimal showing that broad range of products that it describes were presented and demonstrated by Mr. Tyrrell to Fleming **_and_** that Fleming made use of that information to enhance, alter, modify or create products, makes no sense and illegitimatizes proper discovery and pleading.  Fleming has denied in Interrogatories and in the deposition of Mr. Lawrence, both under oath, that any such activities took place.  Similarly, Request No. 5 seeks communications about the same group of products and the same objection applies.  Before being required to bare its financial soul to a competitor, Fleming submits that the Plaintiff must satisfy the Court that its allegations bear at least the façade of legitimacy.

Request 8, 9 and 10 relate to any patent held by the Defendant and any communications that the Defendant has had with anyone including the United States government, regarding those patents. These Requests are very clearly completely irrelevant to any issue raised by the Plaintiff in the Complaint, or anywhere else for that matter. The Defendant has not raised any defense that its own patents are somehow superior to the patent alleged by the Plaintiff, and there is no defense that any patent held by the Defendant is infringed or supersedes or otherwise has any impact on the Plaintiff's claims. Mere curiosity on the part of the Plaintiff can be resolved by searching the public records of the United States patent and trademark office itself to determine if there are patents in the name of the Defendant, its subsidiaries or its principals. Similarly, Request No. 11 seeks communications internally, presumably within the Defendant's confines, and with third parties regarding alleged or potential infringement of the Defendant's intellectual property for the past five years. Inasmuch as there is no claim by the Defendant that the Plaintiff's claim in the Amended Complaint should be dismissed or the Plaintiff should not prevail because of Intellectual Property rights or patent rights of the Defendant, this Request is entirely irrelevant and immaterial to any issue that can legitimately be raised in this litigation.

Request No. 12 goes back to looking for cost and expense data with regard to the backboards, neck immobilization systems and back immobilization system and Request No. 13 requests documents to suppliers relating the same products as well as pricing information. Both of these requests are overbroad, but more fundamentally seek to obtain proprietary and confidential information of the Defendant which has absolutely no relationship to the Tyrrell/Tyrnel neck immobilization system that was demonstrated and

exhibited by Mr. Tyrrell in March of 2000. As stated hereinabove, it is entirely improper and inappropriate to compel the disclosure of such confidential and proprietary information to a competitor based on an unsupported and unsubstantiated allegations of a non-verified Complaint in the face of sworn statement that directly and affirmatively deny and contradict those allegations.

## <u>CONCLUSION AND REQUEST FOR PROTECTIVE ORDER</u>

The Defendant respectfully requests that the Plaintiff's Motion be denied with prejudice.  To the extent that the Court deems it appropriate to allow any discovery of objected to materials sought by the Plaintiff, the Defendant respectfully requests that the Court issue a Protective Order requiring that, until further Order of the Court, all such information, documents and things be kept confidential, be held and retained by the Plaintiff's attorney, that they not be disclosed in whole or in part to the Plaintiff, to any of its principals, shareholders, officers, agents, directors or employees, that it not be disclosed to any person other than the Plaintiff's attorney and his Associates.  The Defendant further requests that to the extent that any such material is Ordered to be produced or disclosed, that the Plaintiff's attorney be directed, at the conclusion of this matter,  to return all such material and/or to destroy it and all references to it.

**THE DEFENDANT**
**FLEMING INDUSTRIES, INC.**


Date: April 28, 2006    BY: /s/ John J. McCarthy, Esq.
                        John J. McCarthy, Esq.
                        Doherty, Wallace, Pillsbury & Murphy, P.C.
                        1414 Main St. 19th Floor
                        Springfield, Ma. 01144
                        (413) 733-3111
                        (413) 734-3910 [fax]
                        jmccarthy@dwpm.com
                        BBO No.: 328280


CERTIFICATE OF SERVICE


        I, John J. McCarthy, Esquire, do hereby certify that on this date, I have caused a copy of the foregoing to be served upon the parties by mailing a copy of same first class mail, postage pre-paid to:

Harris K. Weiner, Esq. (#551981)
Law Office of Jeffrey B. Pine, Esq. PC
321 South Main St., Ste 302
Providence, RI  02903


Dated:          April 28, 2006                    /s/ John J. McCarthy, Esq.
                                                  _____
                                                  John J. McCarthy, Esquire

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

Transcript of the Testimony of:

# Brooke Lawrence

# March 30, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Jennifer Powis   1-18783

*Exh. 1*

1            UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS

2                    SPRINGFIELD

3

4

5

       ---------------------------X

6   TYRNEL ENTERPRISES, INC.

              Plaintiff,

7                               Civil Action

    vs.                         No.: 05-30172-MAP

8

    FLEMING INDUSTRIES, INC., d/b/a

9   IRON DUCK

              Defendant

10     ---------------------------X

11

12

13

14          DEPOSITION OF BROOKE LAWRENCE, a witness

15   called by and on behalf of the Plaintiff, taken

16   pursuant to the provisions of the Federal Rules

17   of Civil Procedure, before Jennifer Powis, a

18   Certified Verbatim Reporter and Notary Public in

19   and for the Commonwealth of Massachusetts, at

20   Liberty Legal Resources, 1365 Main Street, Fourth

21   Floor, Springfield, Massachusetts, on Thursday,

22   March 30, 2006, commencing at 10:06 a.m.

23

24

1

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**2**

APPEARANCES

4 HARRIS K. WEINER, ESQUIRE
5 Law Office of Jeffrey B. Pine
6 The Heritage Building
7 321 South Main Street, Suite 302
8 Providence, Rhode Island 02903
9 (401)351-8200
10   Counsel for the Plaintiff
11
12 JOHN J. McCARTHY, ESQUIRE
13 Doherty, Wallace, Pillsbury & Murphy, P.C.
14 One Monarch Place, Suite 1900
15 Springfield, Massachusetts 01144
16 (413)733-3111
17   Counsel for the Defendant

**3**

INDEX

WITNESS                    EXAMINATION
BROOKE LAWRENCE
(By Mr. Weiner)            5

EXHIBITS
NO.                              PAGE
1  Patent                        63
2  Confidential Disclosure
   Agreement                     71
3  E-mail                        75
4  Letter Dated 4-21-03          79
5  Letter Dated January 14, 2004     81
6  Advertisement                 85
7  Advertisement                 86
8  Advertisement                 86
9  Advertisement                 89
10 Advertisement                 90
11 Advertisement                 91
12 Tyrnel Head Restraint System      92
13 Document                      93
14 Letter Dated August 30, 2004      94
15 Letter Dated May 10, 2004     96
16 Letter Dated April 16, 2004   97
17 Proposed Advertisement 4/16/04    98

(Exhibits were given to the court reporter to
attach to the transcript.)

**4**

STIPULATIONS

2   It is hereby stipulated and agreed by and
3 between counsel for the respective parties that
4 the deponent shall have thirty (30) days in which
5 to read and sign the deposition transcript, after
6 which time it shall be deemed to have been
7 signed, and that the filing and sealing of the
8 deposition transcript are waived.
9   It is further stipulated and agreed that all
10 objections, except objections as to the form of
11 the question, and all motions to strike shall be
12 reserved until the time of trial.
13   BROOKE LAWRENCE, having been satisfactorily
14 identified and duly sworn by the Notary public,
15 was examined and testified as follows in answer
16 to direct interrogatories:

**5**

1   BY MR. WEINER:
2   Q. What is your name, sir?
3   A. Brooke Lawrence.
4   Q. Mr. Lawrence, my name is Harris Weiner and
5 I'll be asking you a series of questions. Your
6 answers to those questions have to be audible so
7 the reporter can properly record them. Do you
8 understand that?
9   A. Yes.
10  Q. You have to wait until I finish my question
11 before you commence answering. Do you understand
12 that?
13  A. Yes.
14  Q. The two of us cannot speak at the same time.
15 All right?
16  A. Perfectly fine.
17  Q. If I ask you a question and you don't
18 understand it, let me know and I will try to
19 rephrase it.
20  A. Okay.
21  Q. If you answer the question I'm going to
22 assume that you've understood what the question
23 asked for and that you are responding to that
24 question, correct?

2 (Pages 2 to 5)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

6

1  A. Correct.
2  Q. Have you been deposed before?
3  A. No.
4  Q. Have you ever testified under oath?
5  A. No.
6  Q. Have you ever been party to a lawsuit?
7  A. No.
8  Q. Have you ever been questioned in connection
9  with a lawsuit?
10  A. No.
11  Q. How old are you, sir?
12  A. Thirty-three.
13  Q. Where are you employed?
14  A. Fleming Industries.
15  Q. Does Fleming Industries operate as a d/b/a?
16  A. As Iron Duck, as a division.
17  Q. What is the relationship between Fleming
18  Industries and Iron Duck?
19  A. Fleming Industries is the parent corporation
20  and Iron Duck is the d/b/a.
21  Q. Is Iron Duck a separately incorporated
22  business?
23  A. It is not.
24  Q. How long has Fleming Industries been in

7

1  existence; do you know?
2  A. 1976.
3  Q. How long has Iron Duck been a name they used?
4  A. I don't have a specific date.
5  Q. Can you estimate?
6  A. Approximately 15 years.
7  Q. Is Iron Duck a reference to anything in
8  particular?
9  A. No, it's just a trade name.
10  Q. Do you know why they chose that?
11  A. Basically got to do with army duck, cotton
12  canvas, durable equipment cases. It was just a
13  catchy name.
14  Q. How long have you worked there?
15  A. Nine years.
16  Q. What's your title?
17  A. Vice president of sales.
18  Q. Have you always held that title?
19  A. No.
20  Q. What was your previous title?
21  A. Field representative.
22  Q. Did that involve sales?
23  A. That involves sales.
24  Q. How long did you do that?

8

1  A. Approximately a year.
2  Q. When did you become vice president of sales?
3  A. Two and a half years ago.
4  Q. What was your --
5  A. Previous title to that?
6  Q. -- title immediately before that?
7  A. Director of sales.
8  Q. How long were you director of sales?
9  A. Approximately four years.
10  Q. Previous to that, what was your title?
11  A. Account representative.
12  Q. Before that, you were a field representative?
13  A. Correct.
14  Q. What's the difference -- what are the duties
15  of a field representative?
16  A. I would work outside of the office with our
17  distributors.
18  Q. Who are your distributors?
19  A. We have many distributors around the world.
20  We currently have approximately 200 distributors.
21  Q. Are these distributors who are independent
22  contractors?
23  A. They're independent corporations.
24  Q. They're not affiliated formerly with Iron

9

1  Duck?
2  A. No.
3  Q. Do they represent only Iron Duck products or
4  do they represent other products as well?
5  A. They represent many other products.
6  Q. Do you have any exclusive distributors?
7  A. No.
8  Q. What industry do your distributors typically
9  sell to?
10  A. Public safety.
11  Q. What are the duties of an account
12  representative?
13  A. Account representative typically would work
14  inside and manage reps. from the office -- from
15  the corporate office.
16  Q. What are the duties of director of sales?
17  A. Manage the account reps. and the field reps.
18  Q. What's the difference between being director
19  of sales and vice president?
20  A. Basically a bump in title. There's really no
21  difference. The director of sales position is
22  currently not filled.
23  Q. What are your present duties?
24  A. Managing the sales floors and overseeing

3 (Pages 6 to 9)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**10**

1  sales volume and market trends, et cetera.
2  Q. How many sales personnel do you have?
3  A. Currently have two.
4  Q. How do you monitor market trends?
5  A. Primarily through tracking our sales volume.
6  Q. Sales volumes in particular products, is
7  that...
8  A. In a particular account not so much product
9  but in total volume across our various product
10  lines.
11  Q. Do you also monitor what your competition is
12  doing?
13  A. No.
14  Q. Do you have trade journals that provide
15  information about the industry?
16  A. Yes, there are trade journals.
17  Q. Can you identify them?
18  A. Emergency Medical Services and Journal of
19  Emergency Medical Services.
20  Q. Do you subscribe to those?
21  A. Yes.
22  Q. And do you personally read them?
23  A. Yes.
24  Q. Are there any trade associations that you

**11**

1  belong to?
2  A. There are not.
3  Q. Are there trade shows that you attend?
4  A. Yes.
5  Q. Can you describe the trade shows that your
6  company attends?
7  A. They're typically managed by both of those
8  magazines, Journal of Emergency Medical Services
9  and Emergency Medical Magazine, and they rotate
10  throughout the year, typically one show a year,
11  and rotates throughout the country.
12  Q. What was the most recent show?
13  A. JEMS, it was last weekend.
14  Q. Where was it?
15  A. Baltimore, Maryland.
16  Q. Do you exhibit at that show?
17  A. On and off. It would depend on city location
18  and current marketing budget.
19  Q. Did you exhibit in Baltimore?
20  A. We did not.
21  Q. What about the year before, did you exhibit?
22  A. We did not.
23  Q. When did you last exhibit?
24  A. At the JEM show we've not exhibited in five

**12**

1  to eight years. Mercy Medical Services, we did
2  exhibit in September/October of last year in New
3  Orleans.
4  Q. Had you been exhibiting every year prior to
5  that at that show?
6  A. No. We typically will do a year on and a
7  year off.
8  Q. And what's entailed when you exhibit?
9  A. Logistics of getting product there, setting
10  up our trade show booth, exhibiting at the trade
11  show, talking about products to public safety
12  personnel.
13  Q. Are you involved in new product development?
14  A. I am.
15  Q. What are some of the activities involved in
16  new product development?
17  A. We monitor -- or we identify potential new
18  trends and develop product to meet those
19  potential trends.
20  Q. You've mentioned a few ways you identify new
21  trends, are there others?
22  A. Not -- no.
23  Q. How do you identify products to meet those
24  trends?

**13**

1  A. By establishing need from field personnel,
2  identify a problem they're having and then try to
3  back into a product for them that solves that
4  problem.
5  Q. How do you "back into a product for them"?
6  A. Research and development, identify their
7  problems, and then see if our current core
8  capabilities match that line of products and if
9  it fits in with what we're doing.
10  Q. How many employees are there at Iron Duck?
11  A. Eighty to one hundred.
12  Q. How many are involved in research and
13  development?
14  A. Two.
15  Q. Who are they?
16  A. Myself and the president of the corporation.
17  Q. Do you have an engineering background?
18  A. I do not.
19  Q. Does he have an engineering background?
20  A. I have an emergency medical services
21  background.
22  Q. Do you know if Mr. Fleming has an engineering
23  background?
24  A. Not to my knowledge.

4 (Pages 10 to 13)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries. Inc., d/b/a Iron Duck

14

1  Q. Mr. Fleming is the owner?
2  A. He is.
3  Q. What's his first name?
4  A. Michael.
5  Q. Does Iron Duck manufacture?
6  A. We do.
7  Q. Have you manufactured new products based on
8  your research and development?
9  A. Yes.
10  Q. What are some of those products?
11  A. Pediatric mobilization product, various carry
12  cases.
13  Q. I'm sorry, what?
14  A. Various -- emergency medical services carry
15  cases, equipment bags, various designs along that
16  line.
17  Q. What does your research and development
18  involve, how do you go about that?
19  A. We identify a problem that a field rep --
20  that the field personnel are having, we work
21  towards a solution to solve that problem.
22  Sometimes it pans out and sometimes it does not.
23  Q. Do you design your own products?
24  A. We design some and we solicit ideas from the

15

1  industry.
2  Q. What are some of the ideas you've solicited
3  from the industry?
4  A. Large MCI mass casualty product to store
5  equipment, pediatric product, flashlight.
6  Q. Have you solicited backboards from the
7  industry?
8  A. We have not.
9  Q. Have you solicited any immobilization systems
10  for head and neck injuries?
11  A. We have.
12  Q. What are some of those products?
13  A. Primarily your client's product was a product
14  that we felt had the potential to be of interest
15  and because of the unique clips with the head
16  system.
17  Q. When you say "we," who are you referring to?
18  A. The corporate entity.
19  Q. And that's you and Mr. Fleming?
20  A. Correct.
21  Q. Let's talk a little bit more about your
22  background. What's your educational background?
23  A. I am an emergency medical technician, cardiac
24  level, which in the state of Rhode Island where I

16

1  am licensed. I currently hold a license and I'm
2  an emergency medical services instructor
3  coordinator, meaning that I train new EMTs, new
4  paramedics.
5  Q. How much field experience do you have as an
6  EMT?
7  A. I've been licensed as an EMT since 1991.
8  Q. How much experience have you had actually in
9  the field performing the duties of an emergency
10  medical technician or a services individual?
11  A. I came off the truck full-time in 1997.
12  Q. Are you saying that from 1991 to 1997, you
13  were in the field dealing with injuries?
14  A. Correct.
15  Q. Was that your full-time job?
16  A. That was my full-time employment.
17  Q. Who were you employed by?
18  A. I was employed by New England Ambulance
19  Service.
20  Q. Where are they headquartered?
21  A. Currently in Johnston, Rhode Island.
22  Q. Who is the principal of that company?
23  A. I believe it's John Vernanico.
24  Q. Was John Celona involved in that company?

17

1  A. I have no recollection. Not to my knowledge.
2  Q. Is that a name -- do you know of the name
3  John Celona?
4  A. I do know the name John Celona.
5  Q. In what context?
6  A. Observations from the news.
7  Q. Have you ever met --
8  A. I've never met Mr. Celona.
9  Q. Have you ever done business with Mr. Celona?
10  A. I have not.
11  Q. Do you know whether he was involved with that
12  ambulance company when you worked there?
13  A. Not to my knowledge.
14  Q. Why did you leave?
15  A. I got a better job at American Ambulance
16  Service in Norwich, Connecticut.
17  Q. What was that job?
18  A. Field technician, and then I worked in the
19  education department there.
20  Q. What is the education department?
21  A. I was in charge of maintaining and
22  recertifying EMTs that worked for the company.
23  Q. Where did you go to high school?
24  A. Coventry High School.

5 (Pages 14 to 17)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**18**

1  Q. What year did you graduate?
2  A. 1991.
3  Q. Did you have any post-secondary education?
4  A. No.
5    MR. McCARTHY: Other than EMT training?
6    MR. WEINER: Correct.
7  Q. (By Mr. Weiner) Where did you receive your
8  EMT training?
9  A. Community College of Rhode Island and
10  American Heart Association.
11  Q. Who was the instructor at CCRI?
12  A. Don Deshaies.
13  Q. I'm sorry, what was the second?
14  A. American Heart Association.
15  Q. Who was the instructor there?
16  A. Tim Walsh.
17  Q. Did you ever take any classes with Joseph
18  Polsinea?
19  A. I know Mr. Polsinea.
20  Q. How do you know him?
21  A. Mr. Polsinea is a, obviously, senator in the
22  state of Rhode Island, and Mr. Polsinea is an
23  active member of the Educational Standards Board
24  of which I have participated developing

**19**

1  curriculum and protocols for the state of Rhode
2  Island.
3  Q. But he's never been your instructor?
4  A. Not directly, no, sir.
5  Q. Of the products that Iron Duck sells, how
6  many are manufactured by the company itself?
7  A. Ninety percent.
8  Q. How many products do you sell, do you know?
9  A. Forty to sixty.
10  Q. Some are from other manufacturers?
11  A. Correct; we outsource some manufacturing.
12  Q. Those are identified as other manufacturers
13  in your catalogs and literature?
14  A. They would be -- they're manufactured by
15  other manufacturers for our brand. So they're
16  private labeled for us.
17  Q. So a purchaser would not necessarily know
18  that they came from another factory?
19  A. Correct.
20  Q. Where do you purchase the materials for your
21  products?
22  A. We have 70 to 80 various suppliers.
23  Q. What about backboards?
24  A. We manufacture our own backboards.

**20**

1  Q. What do you manufacture them from?
2  A. Polyethylene.
3  Q. There are no wood backboards?
4  A. No.
5  Q. Is polyethylene a form of plastic?
6  A. It is a plastic.
7  Q. Where do you get the polyethylene?
8  A. I do not have specific knowledge of that.
9  Q. How does it come to the factory, what does it
10  look like?
11  A. It's a granular powder.
12  Q. Do you have heavy machinery that does
13  injection molding with the powder?
14  A. It's rotationally molded.
15  Q. What does that mean?
16  A. It's a process that you fill the cavity of a
17  tool and the machine or the molder turns on two
18  axes and basically heats the plastic to match the
19  shape of the form of the mold.
20  Q. Have you ever expanded your product line by
21  acquiring another company?
22  A. Not to my knowledge.
23  Q. Have you ever acquired entire lines from
24  another company?

**21**

1  A. Yes, under a royalty agreement.
2  Q. Can you identify those?
3  A. A pediatric mobilization product, a mass
4  casualty product we previously spoke about, and
5  an oxygen carrying system that uses a wire cage.
6  Q. Who did you acquire the pediatric product
7  from?
8  A. Medical -- Advanced Medical Technologies.
9  Q. Are you paying them a royalty?
10  A. Yes, sir.
11  Q. What are the terms of that?
12    MR. McCARTHY: Objection.
13  Instruct him not to answer. I've
14  objected to any financial information.
15  This man is not being produced for that
16  purpose. I object to it being subject to
17  the objections I've already made in
18  written discovery. And for the record,
19  he's being produced without a 30(b)6
20  notice voluntarily by the defendant. So
21  he's not to stand on ceremony and create
22  difficulties but he's vice president of
23  the sales. He's here to testify to areas
24  that have not previously been limited by

6 (Pages 18 to 21)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

---

22

1  our responses to written discovery.
2       MR. WEINER: If that's going to be
3  your position today, because I was
4  planning to ask him a series of questions
5  about royalties, sales, finances in the
6  like, as we've discussed, I'll be filing
7  a motion to compel more responsive
8  discovery answers and production. And I
9  would also reserve the right to keep this
10 deposition open. If there's another
11 individual at the company who's more
12 knowledgeable on those subjects, than
13 this proceeding will simply be recessed
14 rather than closed when we finish today,
15 giving us an opportunity to call that
16 individual, whether it's Mr. Fleming or
17 someone else, and still be in compliance
18 with the deadlines imposed by the court.
19      MR. McCARTHY: I have no objection
20 to that. I'm treating this as if it's a
21 30(b)6, in turn, as we discussed. I'm
22 not attempting to be cute here. I'm just
23 saying rather than making you go through
24 the hoops and me looking foolish saying

---

23

1  you didn't send the right notice to us,
2  we'll treat it as if it's a 30(b)6.
3       I'm assuming that the 30(b) will
4  contain the same request as the written
5  discovery request contained. Thus, my
6  objection would be the same. And so, it
7  is a continuing deposition because we've
8  only produced one individual so far, and
9  if there's other materials, that's fine
10 with me.
11      MR. WEINER: And you agree not to
12 object on the basis that it would be out
13 of time with the --
14      MR. McCARTHY: No. No. That's
15 not going to be a problem for me, and I
16 assume the court would allow us to manage
17 this litigation to a degree that wasn't
18 abusive of the court.
19      MR. WEINER: Thank you.
20 Q. (By Mr. Weiner) But without asking about the
21 details, you've identified three products that
22 are subject to royalty agreements, correct?
23 A. Correct.
24 Q. And you have talked to inventors about their

---

24

1  products when you're involved in new product
2  development, correct?
3  A. Yes, sir.
4  Q. How many times have you done that?
5  A. I couldn't put a number on that. Products
6  come in and we don't have an interest in them.
7  Often we don't even -- I don't have a specific
8  number for you.
9  Q. But does it come up once a year on average?
10 Does it come up once a month? Is it something
11 that you do on a regular basis or is it a highly
12 infrequent occurrence?
13 A. We receive phone calls for people who have
14 ideas. I would say on an average of one a month.
15 Q. How many of those phone calls result in
16 meetings with those people?
17 A. Very few.
18 Q. Can you venture a guess as to percentage?
19 A. Less than 10 percent.
20 Q. So you don't take a meeting unless you think
21 that there is a useful purpose?
22 A. Or if it's within our capabilities or our
23 product line scope.
24 Q. Do you solicit those ideas from outside

---

25

1  parties?
2  A. We don't actively solicit for ideas.
3  Q. Have you been assigned any intellectual
4  property rights?
5  A. We own a couple -- actually one patent.
6  Q. What's that on?
7  A. It's a parasite removing tool.
8  Q. Would that be a leech?
9  A. Tick.
10 Q. I was being facetious. How does it work?
11 A. It simply pries the tick from the skin.
12 Q. What does it look like?
13 A. A spoon with a slide.
14 Q. Do you know when that patent was registered?
15 A. Within the last 18 months.
16 Q. In whose name is it?
17 A. Myself and Mr. Fleming's and a gentleman by
18 the name of Jim Morris.
19 Q. When was the product developed?
20 A. Over the last 24 months.
21 Q. Was it developed in response to a need?
22 A. It was developed as an improvement on what
23 was currently on the market.
24 Q. Did you know that from feedback from your

---

7 (Pages 22 to 25)

Brooke Lawrence 3-30-2006
Tymel Enterprises. Inc. v. Fleming Industries. Inc.. d/b/a Iron Duck

26

1  sales people?
2  A. Yes. It's actually -- it's unique feature is
3  that you can slide a cover over the top of the
4  spoon to contain the tick so that it doesn't
5  escape so you can have it tested for lyme or
6  other pathogens.
7  Q. Did you work in a laboratory on this product?
8  A. Informally, in our facility. It's been field
9  tested. Our prototype was field tested by some
10  veterinarians.
11  Q. How was the prototype developed?
12  A. Trial and error.
13  Q. Who physically put it together?
14  A. Mr. Morris.
15  Q. What were the components?
16  A. Basically a spoon and then a slide that goes
17  over the top of the spoon and a key chain.
18  Q. What was your contribution to the development
19  of the product?
20  A. I participated in -- throughout the design
21  process of providing input and kind of
22  fine-tuning its design once we had a rough field
23  for its direction.
24  Q. What was Mr. Fleming's contribution?

27

1  A. The same. It was a collaborative effort.
2  Q. Were you involved in the application for the
3  patent?
4  A. Other than meeting with our patent attorney,
5  no.
6  Q. Was Mr. Fleming involved to a greater extent
7  than you?
8  A. No. We basically developed the product,
9  created the drawings from our overseas
10  manufacturer, and then we filed our patent.
11  Q. Where is it manufactured?
12  A. China.
13  Q. What's the name of the factory, do you know?
14  A. I have no knowledge of that.
15  Q. Who is your patent attorney for this
16  application?
17  A. Deborah Basile.
18  Q. And she's at Mr. McCarthy's law firm?
19  A. She is.
20      MR. McCARTHY: Could you just say
21  that we're partners. I don't want her to
22  read that she's at my law firm.
23  Q. (By Mr. Weiner) She's an associate of
24  Mr. McCarthy?

28

1  A. She is an associate of Mr. McCarthy's.
2      MR. WEINER: Does that make it
3  worse?
4      MR. McCARTHY: Yeah, it does.
5  She's a partner.
6  Q. (By Mr. Weiner) Are there any product lines
7  you sell to markets other than the public safety
8  market?
9  A. We sell the tick tool to the pet industry.
10  Q. Do you have any other products you sell
11  outside the public safety market?
12  A. We do not.
13  Q. Can you describe in greater detail what the
14  public safety market is?
15  A. Police, fire, and EMS agencies.
16  Q. Where are your customers located?
17  A. Every street corner in America.
18  Q. Are you the dominant supplier in your
19  industry?
20  A. That's actually undeterminable because of the
21  niche nature of the market.
22  Q. You must have some sense of how you stack up
23  with your competitors. Do you know who your
24  competitors are?

29

1  A. Ferno Washington Pacific Safety Products.
2  It's a very niche market.
3  Q. Are you the leader in that niche market in
4  terms of sales volume?
5  A. I do not know what their product sales data
6  is so I can't make that determination.
7  Q. Do you have a sense of whether you have more
8  employees than either of your competitors?
9  A. I do not.
10  Q. Have you ever seen their headquarters?
11  A. I have not.
12  Q. Do you have some of the same distributors?
13  A. Yes, we do.
14  Q. Do they give you feedback as to whose
15  products are selling at a higher volume?
16  A. We do not ask those questions for ethics
17  reasons.
18  Q. But has that information ever been offered to
19  you?
20  A. It has not been offered to me.
21  Q. Do you have any sense of where you stack up
22  against your competitors in terms of market
23  share?
24  A. I would like to think that we're the leader

8 (Pages 26 to 29)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

30

1   but I cannot quantify that.
2   Q. But do you think it's likely that you're the
3   leader in the market?
4   A. Again, I cannot quantify it.
5   Q. I just want to understand when you say "I
6   would like to think that we are," is that wishful
7   thinking or is that a sense that your company is
8   selling the most product in this business?
9   A. It's a sense. We feel that we are but we
10  cannot quantify it. Based upon, most of these
11  companies are all privately owned.
12  Q. How long have you been selling backboards?
13  A. Myself?
14  Q. The company.
15  A. I do not have a specific date.
16  Q. Do you know approximately how many backboards
17  you sold last year?
18  A. I feel that that's a trade secret, if you
19  will.
20      MR. McCARTHY: I'll object to volume of
21  sales. I mean, we've raised that objection.
22      MR. WEINER: But he is the director of
23  sales and he has that information. So your
24  objection is on another basis?

31

1       MR. McCARTHY: My objection as stated in
2   writing is that until -- I want the court to
3   establish that there's some relevancy. Because
4   we don't believe there's anything contained in
5   the allegations of the -- support of allegations
6   of the complaint that relate to backboards
7   because that's not what your client or the
8   principal of your client came in and offered to
9   Iron Duck and Fleming. And we're not going to
10  sit back and allow a fishing expedition by
11  someone who is potentially a competitor or
12  dealing with competitors and obtain that
13  information.
14  Q. (By Mr. Weiner) Would you agree that
15  backboards are one of your major products?
16  A. I would agree that backboards are one of our
17  products.
18  Q. Of the 40 to 60 products you sell, how many
19  are backboards?
20  A. Eight to nine.
21  Q. Do you sell head restraint systems?
22  A. We do.
23  Q. Of your 40 to 60 products, how many are head
24  restraint systems?

32

1   A. Two.
2   Q. Now, do you recall meeting with Martin
3   Tyrrell in approximately March of 2000?
4   A. I do.
5   Q. Prior to that meeting, you were selling
6   backboards, correct?
7   A. Correct.
8   Q. And you were selling head restraint systems?
9   A. Correct.
10  Q. And you were selling head blocks?
11  A. As a component to head mobilization systems.
12  Q. Were you selling straps with pins?
13  A. I'm sorry. Rephrase your question.
14  Q. Were you selling straps that clipped into
15  other receptacle straps?
16  A. We sold straps that clipped on backboards to
17  mobilize the patient's body.
18  Q. How did they attach to the backboards?
19  A. Speed clip.
20  Q. Can you describe speed clip?
21  A. It's a swivel snap hook, basically a C-shaped
22  clip with a spring gate that connects to the
23  straps.
24  Q. Is there a male and a female match that form

33

1   the clip?
2   A. In the buckle, not in the clip.
3   Q. In the buckle. What's the difference between
4   the buckle and the clip?
5   A. The clip attaches to the board. The buckle
6   marries the two sides of the strap.
7   Q. Did you also sell Velcro --
8   A. We did.
9   Q. Straps with Velcro?
10  A. Yes.
11  Q. What other types of straps did you sell?
12  A. Single piece straps, various lengths, with
13  seat belt style buckle, whether one piece or two
14  piece. And then various systems to mobilize a
15  patient.
16  Q. After March of 2000, what changes did you
17  make in your product line regarding backboards
18  and/or head restraint systems?
19  A. I'm sorry. Rephrase your question.
20  Q. After March of 2000, what changes did the
21  company make in its backboards and/or head
22  stabilization or head restraint systems?
23  A. None.
24  Q. You haven't made any changes since March of

9 (Pages 30 to 33)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc.. d/b/a Iron Duck

| 34 | 36 |
|---|---|
| 1  2000? | 1  A. I did not. |
| 2  A. To boards, we have not. | 2  Q. So I think you're saying that after the |
| 3  Q. Have you made changes to head restraint | 3  meeting, the only change in any of your product |
| 4  systems? | 4  lines was some samples and prototypes that you |
| 5  A. We test-marketed your client's head | 5  shared with distributors? |
| 6  mobilization system with the head block and the | 6  A. Correct. |
| 7  strap. I mean, that was of interest. That was | 7  Q. Those were of my client's design? |
| 8  the only thing of interest to us at the time | 8  A. The head mobilization system, the blocks and |
| 9  where we provided samples of that device to our | 9  the straps with the clips. |
| 10  distributors and drop ships to the marketplace | 10  Q. Let's talk about the meeting itself. Do you |
| 11  with no result. | 11  remember when you were first contacted by |
| 12  Q. Did you change your catalogs to reflect those | 12  Mr. Tyrrell? |
| 13  changes? | 13  A. I do not. |
| 14  A. We do not produce a printed catalog. Our | 14  Q. Did he contact you or did you contact him? |
| 15  distributors print catalogs. | 15  A. Since we do not actively -- I don't know |
| 16  Q. Do you know whether my client's design | 16  Mr. Tyrrell prior to this encounter, so I would |
| 17  appeared in any of your distributors' | 17  assume that he contacted me. |
| 18  catalogs? | 18  Q. Any recollection of the contact? |
| 19      MR. McCARTHY: Just for clarity | 19  A. No. |
| 20  sake, because there's allegations of | 20  Q. Do you remember setting up the meeting? |
| 21  multiple designs, what -- | 21  A. The only thing I remember that was unique |
| 22  Q. (By Mr. Weiner) With respect to his | 22  about the meeting is that it took place on my |
| 23  stabilization system involving two straps, head | 23  birthday. |
| 24  stabilization, as well as full body restraint? | 24  Q. Who handles your schedule? |

| 35 | 37 |
|---|---|
| 1  A. I believe that the head mobilization system | 1  A. Myself. |
| 2  appeared in a catalog. | 2  Q. Did you talk to Mr. Tyrrell prior to the |
| 3  Q. Which one was that? | 3  meeting to schedule it? |
| 4  A. I do not recall at this time. | 4  A. Since I manage my schedule, I would have to |
| 5  Q. You do not recall which distributor? | 5  say yes. |
| 6  A. I do not recall which distributor. | 6  Q. But you don't have any memory of that |
| 7  Q. Do you know if they sold any? | 7  conversation? |
| 8  A. To my knowledge, they did not. | 8  A. No, sir. |
| 9  Q. Did you check with them? | 9  Q. What is your birthday? |
| 10  A. We queried our sales records and there were | 10  A. 29 March 1973. |
| 11  no sales of that product to the distributor, to | 11  Q. Where did you meet? |
| 12  any distributor. | 12  A. My conference room. |
| 13  Q. How did you check the records, did you | 13  Q. Where is that located? |
| 14  personally check them? | 14  A. 20 Veterans Drive in Chicopee, Massachusetts. |
| 15  A. Yes, I did. | 15  Q. That's the headquarters for Iron Duck? |
| 16  Q. Did you check them on-line? | 16  A. That is correct. |
| 17  A. It's in our proprietary data base of | 17  Q. Who else was there? |
| 18  information. | 18  A. Myself and -- I was the only one in the |
| 19  Q. Do you have hard copy records of sales? | 19  meeting with Mr. Tyrrell. |
| 20  A. We do not. | 20  Q. Do you recall whether he brought anything to |
| 21  Q. Everything is computerized? | 21  the meeting? |
| 22  A. Correct. | 22  A. I recall the foam head blocks and the straps, |
| 23  Q. You didn't delegate this investigation to | 23  and I do not recall if there was a board or whole |
| 24  anyone else? | 24  board or a half board. |

10 (Pages 34 to 37)

Brooke Lawrence 3-30-2006
Tyrrel Enterprises. Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**38**

1  Q. Was this a prototype that he was bringing for
2  demonstration?
3  A. I would have to assume that.
4  Q. Did he just bring one?
5  A. I do not recall that.
6  Q. So he may have brought additional material,
7  or is that the only material that you recall?
8  A. I recall the head block -- I recall the strap
9  with the clip on it and the head block -- the
10  foam head block.
11  Q. Now, in your conference room, were there
12  other products of Iron Duck on display?
13  A. I do not recall at that time.
14  Q. Do you recall whether you showed him other
15  products?
16  A. I do not recall that.
17  Q. Do you recall whether you discussed with him
18  a need in the marketplace for a better
19  stabilization system?
20  A. I do not.
21  Q. What do you recall about the conversation?
22  A. That his -- that the speed clips were a
23  unique concept. That, in my clinical experience,
24  would save some time for personnel. And that was

**39**

1  the only thing that was really interesting about
2  the product.
3  Q. Do you remember why you took the meeting?
4  A. I do not recall why I took the meeting other
5  than that it would have fallen into our core
6  competencies.
7  Q. What was it about Mr. Tyrrell's communication
8  that made you say he's one of the few people I
9  actually want to meet to discuss his product?
10  A. It was a core competency; it was in our core
11  products.
12  Q. Can you explain that in plainer language?
13  A. It was a backboard system or a mobilization
14  system. It was a carry case. It was something
15  that we do in and day out. It wasn't like it
16  was an airway management device which is outside
17  of our box. It was a product that fit inside of
18  our box.
19  Q. What made you think that this product was
20  different from what you were already selling?
21  A. The unique feature of the clips and the
22  straps. That was its uniqueness.
23  Q. Specifically, what was unique about the
24  clips?

**40**

1  A. That the clip would interact with pins that
2  we were currently putting in backboards.
3  Q. Can you describe what the pin looks like?
4  A. The pin is a fiberglass pin that gets slotted
5  along the patient's sides for strapping, body
6  strapping. It's a utilitarian device for a speed
7  clip which I previously described.
8  Q. What does the pin look like?
9  A. It's a three-sixteenths pin that's placed
10  through the side of the board into the -- so it
11  would be in various locations down the side of
12  the board to speed in the immobilization of a
13  victim.
14  Q. Is the pin shaped in a particular way?
15  A. It's a cylindrical pin. Ours are made of
16  fiberglass. Others are made of rolled steel.
17  Q. How big is it around?
18  A. It's about three-sixteenths in diameter.
19  Q. What makes the clip connect with it and lock
20  in?
21  A. The clip has a gate and it locks onto the
22  pin. The pin is secured through the side of the
23  board. So it's reinforced in the plastic.
24  Q. So the board has to have holes in order to

**41**

1  insert the pin?
2  A. Correct.
3  Q. Has the configuration of holes in your
4  backboard product lines changed since March of
5  2000?
6  A. It has not.
7  Q. You haven't added holes?
8  A. We've added products. We've never added
9  holes to boards.
10  Q. So there have been some changes in the
11  product line since March of 2000?
12  A. We've added an 18-inch wide product.
13  Q. What's that one called?
14  A. The Ultra-Vue 18.
15  Q. When was that added?
16  A. I don't have a specific date but within the
17  last 18 to 24 months.
18  Q. Are the holes on the Ultra-Vue 18 located
19  differently than the other products?
20  A. They're various missions. So the holes would
21  be placed according to the objection of the
22  product.
23  Q. Are the holes on the Ultra-Vue 18 higher or
24  lower than your other products at the top of the

11 (Pages 38 to 41)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**42**

1    board?
2    A. They're identical to the Ultra-Vue.
3    Q. How long have you sold the Ultra-Vue?
4    A. It predated my arrival at Iron Duck.
5    Q. So the Ultra-Vue 18, other than being a wider
6    board, has the same hole configuration as the
7    Ultra-Vue product?
8    A. That is correct.
9    Q. Has Iron Duck introduced any products with a
10   new hole configuration on the board since March
11   of 2000?
12   A. Not to my recollection.
13   Q. Does that mean you're uncertain?
14   A. I don't have specific dates of product
15   launches available to me.
16   Q. So is it possible that there has been a board
17   introduced that has a new configuration of holes?
18   A. The Ultra-Vue 18 was one, and I don't have
19   any specific dates for any of the products.
20   Q. Going back to the meeting, how long did it
21   last?
22   A. I do not recall.
23   Q. Was it a lengthy meeting?
24   A. It certainly wasn't all day. It was a

**43**

1    relatively simple concept. I could not put a
2    time on it for you.
3    Q. Do you recall what you said, in substance, to
4    Mr. Tyrrell regarding his invention?
5    A. Obviously I felt that it had some merit.
6    Usually if you can get in the door, it has some
7    merit. I felt that the unique feature of the
8    speed clips with the straps marry to our products
9    well and that we would show it to the industry
10   and get a feel and gauge market response and to
11   see if they felt that there was -- that if the
12   product, as we would term it, had legs.
13   Q. Do you recall that you signed a nondisclosure
14   agreement in connection with that meeting?
15   A. Yes, I did.
16   Q. Who drafted that?
17   A. I believe that was Mr. Tyrrell's document.
18   Q. Did he tell you why he needed a nondisclosure
19   agreement?
20   A. He did not.
21   Q. Do you remember any discussions about that
22   agreement?
23   A. I do not remember anything specific to the
24   agreement.

**44**

1    Q. But you agreed to sign it?
2    A. I did agree to sign it, yes.
3    Q. Did you discuss showing his invention to your
4    distributors at the meeting?
5    A. Yes.
6    Q. How was that reconciled with the
7    nondisclosure agreement?
8    A. It was a mutual agreement between myself and
9    Mr. Tyrrell. To take the product internally I
10   need to show it to people outside of my office to
11   see it and gauge their market reaction, to feel
12   if that my enthusiasm or my gut feeling was
13   correct. So it needs to be bounced off other
14   people in the industry to see if they felt that
15   that was the case.
16   Q. Is it your testimony that you told
17   Mr. Tyrrell that was what you were going to do?
18   A. Yes, it is.
19   Q. Is it your testimony that he agreed?
20   A. Yes, it is.
21   Q. Who did you show it to?
22   A. I don't have specific names.
23   Q. How many parties did you show it to?
24   A. I don't have a specific number.

**45**

1    Q. Did you show it to two distributors or was it
2    dozens?
3    A. It would be a small number of distributors.
4    Q. How small?
5    A. I don't know. Generally four to five, six.
6    Q. Did you show the product to anyone else?
7    A. I don't have specific recollection.
8    Q. Did you show it to Mr. Fleming?
9    A. Of course.
10   Q. Did you show it to any other personnel at
11   Iron Duck?
12   A. I don't specifically recall but we would talk
13   about it in a sales meeting.
14   Q. Did you talk about it with anyone outside the
15   company other than distributors?
16   A. I do not recall.
17   Q. Again, you don't know whether you did?
18   A. I don't recall showing it to anybody outside
19   of our distribution channels. If you'd give me
20   an example --
21   Q. We're talking about discussing it, though.
22   Did you discuss it with your wife, if you're
23   married?
24   A. I am married. I typically leave work at

12 (Pages 42 to 45)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

---

46

1   work.
2   Q. Did you discuss it with any of your poker
3   buddies?
4   A. Not to my knowledge.
5   Q. Did you discuss it with anyone who wasn't
6   employed by Iron Duck or one of your
7   distributors?
8   A. Not to my knowledge.
9   Q. Is it possible that you did?
10  A. Certainly could be possible but not to my
11  knowledge.
12  Q. Did Mr. Tyrrell tell you that he was applying
13  for a patent?
14  A. I do not recall.
15  Q. Did the subject of patent status of the
16  invention ever come up in your meeting?
17  A. I do not recall specifically.
18  Q. Do you know where the prototypes are now?
19  A. I do not.
20  Q. Did you ask them to return them to you?
21  A. It's a disposable product. And if it was
22  used in the field, it would have been
23  contaminated, potentially contaminate.
24  Q. Did you agree to test market it in the field?

---

47

1   A. We would -- in my conversation in the normal
2   course of things, it's a relatively low dollar
3   item, I would have a marketing budget that I
4   could produce some samples, put it into the
5   market, and see what -- gauge the response of the
6   product.
7   Q. Is it your memory that you produced four of
8   five of these for distributors from your
9   marketing budget?
10  A. Sure. I mean, it could have been -- we would
11  have had to have done that in order to show the
12  product.
13  Q. How much of an investment was that at Iron
14  Duck?
15  A. Two to $400.
16  Q. During the course of your meeting with
17  Mr. Tyrrell, what representations did you make to
18  him about the next step?
19  A. The next step at that point would have been
20  to do what I've previously stated, show it to the
21  market, do a test market, and see what the
22  response is to the product.
23  Q. Did you tell him that you would get back to
24  him in a particular length of time?

---

48

1   A. I do not recall that.
2   Q. Did you talk about a royalty schedule?
3   A. Not at that time.
4   Q. Did you talk about royalties in general?
5   A. I'm sure we would have. That's how we
6   typically do things like that.
7   Q. Did he tell you what he was looking for in
8   terms of money?
9   A. Not to my recollection.
10  Q. Did you discuss the distribution capacities
11  of Iron Duck?
12  A. I'm sure we would have.
13  Q. Did you tell him that you were capable of
14  selling a high volume of product?
15  A. If the market was willing to accept it, yes.
16  Q. Were any other agreements reached during the
17  course of that meeting?
18  A. Not to my recollection.
19  Q. So there was nondisclosure, correct?
20  A. Correct.
21  Q. There was your promise to test market it,
22  correct?
23  A. Correct.
24  Q. Anything else discussed?

---

49

1   A. I do not recall anything else.
2   Q. Did you talk about the market for these
3   products in general?
4   A. I do not recall specifics but likely would
5   have talked about the entire market and what
6   currently is going on.
7   Q. Do you think you may have talked about
8   comparative products?
9   A. I do not recall that specifically.
10  Q. And you don't recall showing him other
11  products physically in the room?
12  A. I do not.
13  Q. What was your impression of Mr. Tyrrell?
14  A. I thought he had a unique head mobilization
15  strap. Other than that, I couldn't pick him up
16  out of a line-up.
17  Q. Did you find him credible?
18  A. He was licensed and articulate. You wouldn't
19  want to invest in a relationship that potentially
20  did not start well. I mean, certainly if I were
21  to get to the point that I would say we're going
22  to do a test market and see what the market will
23  bear, he would certainly have to be credible at
24  that point.

13 (Pages 46 to 49)

Brooke Lawrence 3-30-2006
Tyrrel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

50

1  Q. So is it fair to say that you were favorably
2  impressed by him personally?
3  A. I was impressed by his strap and clip.
4  Q. But you must have formed some opinion about
5  him as an individual?
6  A. Other than --
7      MR. McCARTHY: Objection. You can
8  answer.
9      THE WITNESS: I mean, he was
10  licensed, he represented himself as a
11  medic, he could walk the walk and talk
12  the talk. He appeared credible.
13  Q. (By Mr. Weiner) Do you recall speaking with
14  him after the meeting?
15  A. I do not. Actually, I do not recall speaking
16  to him after the meeting.
17  Q. So you haven't spoken to him since March 29th
18  of 2000?
19  A. Approximately a year ago he approached me at
20  Fenway Park at a trade show sponsored by American
21  Medical Response and tried to engage me in a
22  conversation and I simply entertained the fact
23  that that was not the time or the place to
24  discuss it in a room full of people -- a very

51

1  full room of people at the ball park.
2  Q. So it was in a hospitality room at Fenway?
3  A. It was in their Hall of Fame club. I'm not
4  sure of the exact name of the room but it was a
5  thing that we do to support American Medical
6  Response, who I believe is his employer, and show
7  products during EMS week. So that likely would
8  have been in the third week of May.
9  Q. So he was an invitee you think?
10  A. I would have to assume that if he was there,
11  yes, sir.
12  Q. Other than that encounter, have you had any
13  conversations with him?
14  A. I have not.
15  Q. Do you know whether he telephoned your
16  office?
17  A. I do not specifically recall him phoning our
18  office.
19  Q. Do you know whether he e-mailed?
20  A. There is an e-mail in the documentation
21  provided. I do not know the specific date when
22  he sent an e-mail to our facility and then I
23  believe I replied to him a couple of days later
24  asking him to phone me.

52

1  Q. But he never placed that call, to your
2  knowledge?
3  A. Not to my knowledge, no.
4  Q. Did you e-mail back to him anything other
5  than phone me?
6  A. Not to my knowledge.
7  Q. Did you ever show him the test market
8  results?
9  A. Not to my recollection.
10  Q. Did you share those results with anyone?
11  A. Other than Mr. Fleming, no.
12  Q. Do you recall any other conversations about
13  the samples you made of Mr. Tyrrell's product
14  with anyone, anyone at Iron Duck? We'll start
15  there. Do you recall conversations you had with
16  Mr. Fleming?
17  A. I do not. Other than the test failed.
18  Q. What about other sales people?
19  A. I mean, it would be routine that we would
20  discontinue the test and I would brief my people
21  on that.
22  Q. Who did you brief?
23  A. I do not recall who was working for me at
24  that time.

53

1  Q. Did you discuss it with any of your
2  production people?
3  A. We certainly would have told -- well
4  production would have made a test batch and then
5  that would have been that.
6  Q. Did you have any conversations with the
7  distributors regarding the test results?
8  A. I don't have a specific recollection of a
9  specific conversation with anybody but it
10  certainly would have been a discontinued item.
11  Q. Can you think of any other parties you spoke
12  to about the product?
13  A. I do not recall any other.
14  Q. At some point, though, you did talk to your
15  lawyers about it?
16  A. Correct, after we were contacted by --
17      THE WITNESS: Sorry. Who was the
18  attorney, McGonagle? And then that's all
19  in the documentation that I'm sure you've
20  seen.
21  Q. (By Mr. Weiner) I'm not asking about
22  conversations you've had with your attorneys. At
23  some point, did you renew your interest in the
24  products?

14 (Pages 50 to 53)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises. Inc. v. Fleming Industries. Inc.. d/b/a Iron Duck

54

1  A. I do not recall. There has been a lot of
2  back and forth. I do not recall a specific
3  interest.
4  Q. Did you make a royalty proposal to
5  Mr. Tyrrell at some point?
6  A. I believe we did.
7  Q. When was that?
8  A. I do not remember the date.
9  Q. What prompted that?
10 A. Settlement.
11 Q. Was that based on his allegation of
12 infringement of his patent?
13 A. I would assume that if he was -- if we were
14 looking to maybe renew the interest. Times
15 change and there's been six years yesterday since
16 the initial contact and the marketplace changes.
17 Q. So was the product now of interest to the
18 company as something it could sell?
19 A. I think we would look at anything at any
20 point. Potentially, that could be a case because
21 of the changing marketplace. That was a pre-911
22 world; money, budget any number of factors could
23 influence a change in the paradigm of the
24 marketplace.

55

1  Q. Has business improved post-911 for the public
2  safety sector?
3  A. There's certainly more grant money available,
4  more preparedness as a whole as a country.
5  Q. So did you view, after 911, Mr. Tyrrell's
6  product as being more viable?
7  A. Not directly not-post 911. I mean, it was --
8  the market shifted towards mass casualty products
9  in a very rapid manor basically overnight.
10 Q. As of say 2004, did you see potential for his
11 product?
12 A. Marketplace four years later could be ready
13 for a product that previously wasn't ready.
14 That's probably why we were willing to take
15 another shot at it.
16 Q. Are you selling to end users for the most
17 part?
18 A. We are not, no.
19 Q. So you don't deal with individual fire
20 departments, per se?
21 A. No, sir.
22 Q. Your distributors deal with them?
23 A. Correct.
24    MR. McCARTHY: Can I just clarify.

56

1  You mean in terms of direct sales?
2    MR. WEINER: That's right.
3    MR. McCARTHY: Because there are
4  involvements that he would have in terms
5  of product demonstrations or educational
6  situations with individual departments.
7    THE WITNESS: Correct. We do not
8  have a direct financial transaction with
9  any particular fire department. We have
10 a marketing contact with those
11 departments, but a direct sale, we go
12 through distribution.
13 Q. (By Mr. Weiner) That marketing supports your
14 distributors?
15 A. Correct.
16 Q. And they'd be upset with you if you started
17 selling direct?
18 A. Very.
19 Q. And you indicate that you do not create your
20 own catalogs?
21 A. No, we use our distributors' catalogs. We
22 will print product sale sheets, tear sheet if you
23 will. We've taken a couple of stabs at the
24 internally produced catalog but very limited

57

1  numbers. Basically so our distributors have a
2  profile; three-ring binder, if you will.
3  Q. Who does the photography for what your
4  distributors include in their catalogs?
5  A. We do that in-house, and our distributors
6  will also photograph a product as well.
7  Q. You allow them to do that?
8  A. Yes, we do.
9  Q. Who provides the text, is that something that
10 you do in-house?
11 A. Sometimes we do, but often the distributors
12 will tweak, and as space permits, they'll make
13 modifications. We don't have a lot of control
14 over that process.
15 Q. Now, you said you took one stab at your own
16 catalogs, when was that?
17 A. '04. We've professionally printed product,
18 catalogs, actually before I arrived at Iron Duck,
19 but '04 we produced more of a leaflet kind of
20 catalog.
21 Q. How many did you make?
22 A. I don't know a specific number.
23 Q. Who did you give them to?
24 A. Our dealers.

15 (Pages 54 to 57)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**58**

1  Q. Now, you say that you -- in terms of
2  marketing, you go to trade shows?
3  A. Mm-hmm.
4  Q. You provide information to your distributors?
5  A. Yes.
6  Q. You provide some support services to end
7  users for educational and instructive purposes,
8  correct?
9  A. Not for educational purposes. As far as a
10 clinical education?
11 Q. Information about your product line?
12 A. Yes, we do that. We do not provide clinical
13 information about our product or how they should
14 be used because they should follow local
15 protocols and guidelines.
16 Q. Do you have a website?
17 A. We do.
18 Q. Do you do internet sales?
19 A. We do not sell on the internet.
20 Q. Are all of your products listed on the
21 website?
22 A. I would hope so but often it's -- various
23 people have been managing it over the years and
24 it's, admittedly, been mismanaged.

**59**

1  Q. But to the extent, practical, you try to keep
2  it updated?
3  A. Try to have high volume products on there and
4  information available.
5  Q. Do you monitor the number of hits or contacts
6  on the web?
7  A. We do from the standpoint that it's
8  available. We don't put much faith in those
9  numbers.
10 Q. Do you buy key words from search engines?
11 A. We do not.
12 Q. So you don't do any pop-up advertising?
13 A. No.
14 Q. You don't do any sponsored sites?
15 A. We do not.
16 Q. What other marketing efforts do you engage
17 in?
18 A. We give a lot of product away.
19 Q. How is that done?
20 A. We will -- in various card stock programs
21 we'll talk to our dealers, if they have a
22 specific need or field rep, we'll send them free
23 samples.
24 Q. Do you send free samples to end users?

**60**

1  A. We occasionally, depending on the product or
2  product size, if it's a disposable type product,
3  we'll drop product into drop shipments that we do
4  for our dealers.
5  Q. Do you do any surveys?
6  A. At trade shows and via telephone, we do, of
7  large municipalities.
8  Q. So you've used telephone survey services?
9  A. No, my sales people do that.
10 Q. So it's an informal survey --
11 A. It's an informal -- they'll work off of a
12 sheet of various information that we're trying to
13 gather.
14 Q. Who designs the questions?
15 A. I do.
16 Q. Do you use telemarketers at all?
17 A. We do not.
18 Q. Do you do any bidding for contracts with
19 government agencies or large --
20 A. We have held government contracts in the
21 past.
22 Q. Did you have to supply a bid for prices of
23 product?
24 A. Yes, we did.

**61**

1  Q. Was that done through a distributor?
2  A. That was to the U.S. government on a carry
3  case requirement.
4  Q. Do you ever participate with your
5  distributors in public bids?
6  A. I'm sorry. Rephrase.
7  Q. Do you ever work with your distributors in
8  bidding for a municipal contract or a state
9  contract?
10 A. If we're aware of it and they're not, we pass
11 the information along and we provide them with
12 pricing.
13 Q. Other than the federal contract you just
14 referenced, you don't bid directly?
15 A. Not as a matter of practice.
16 Q. Now, you mentioned that you had 40 to 60
17 products, approximately 8 of which are
18 backboards, 2 of which are head stabilization
19 systems. What are the other products?
20 A. Carry cases, straps, extrication products, an
21 oxygen regulator.
22 Q. Can you tell me what you mean by "extrication
23 products"?
24 A. If you were involved in a motor vehicle

16 (Pages 58 to 61)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**62**

1  accident and you'd be seated in your car, in
2  order to keep your head neutral in line, there's
3  a product, it kind of looks like a big vest that
4  would be slipped in behind your back and it would
5  come up underneath your armpits and strap around
6  in the front with three straps. And then your
7  head would also be kind of tied into a similar
8  manner, and then there are two groin straps so
9  that would keep you upright and your head neutral
10  and in-line position so they could rotate you out
11  of the vehicle onto a backboard and then
12  transport you to the hospital.
13  Q. But you're not selling the Jaws of Life?
14  A. No, we're not doing that type of stuff, no.
15  Q. Do you sell internationally?
16  A. We do.
17  Q. What other countries do you sell?
18  A. Europe, Asia, South America, Canada.
19  Q. Is it a significant amount of your business,
20  overseas?
21  A. No, it's not.
22  Q. Does Fleming Industries have any other
23  affiliates?
24  A. We have a division that the tick tool is

**63**

1  marketed through called Pet Medic.
2  Q. Is that separately incorporated?
3  A. It is not.
4  Q. It's a division?
5  A. It's just a division.
6  Q. Are there any other related companies?
7  A. Not to my knowledge, sir.
8  Q. Is Mr. Fleming the founder?
9  A. Mr. Fleming's father is the founder.
10  Q. Are there other members of the Fleming family
11  in the business?
12  A. The accountant or the CFO is Mr. Fleming's
13  aunt.
14  Q. Are you related to the Flemings?
15  A. I am not, sir.
16  Q. Do they have other relatives in the business?
17  A. Not currently.
18  Q. Were there any other relatives in the
19  business in March of 2000?
20  A. I do not recall.
21  Q. What's Mr. Fleming's title?
22  A. President and CEO.
23  Q. How many vice presidents are there?
24  A. Just myself, and Sheila Fleming is the

**64**

1  executive vice president.
2  Q. She's --
3  A. She's in finance.
4  Q. She's a chief financial officer?
5  A. That's correct, sir.
6  Q. Who else is in management?
7  A. A production manager, which is currently an
8  open position, Mr. Fleming, myself, and Mrs.
9  Fleming -- Ms. Fleming.
10  Q. Have you discussed this lawsuit with anyone
11  other than your lawyers?
12  A. I have not. Mr. Fleming, of course.
13  Q. Anyone else at the company?
14  A. Not directly. I mean, there's office
15  scuttlebutt but that's the extend of that. They
16  don't know details.
17  Q. Is the company involved in any other
18  litigation?
19  A. Not to my knowledge, sir.
20      MR. WEINER: I'm going to be
21  referring to some of these documents and
22  I'm going to mark some exhibits in the
23  order in which they appear.
24      MR. McCARTHY: Okay.

**65**

1      MR. WEINER: Can you mark this as
2  Exhibit 1.
3      (Exhibit-1, Patent, marked for
4  identification.)
5  Q. (By Mr. Weiner) Mr. Lawrence, I'm showing you
6  what has been marked as Exhibit 1. And it is
7  identified as a patent. Have you ever seen that
8  before?
9  A. I have.
10  Q. When did you see it first?
11  A. I do not have a specific date that I recall.
12  Q. Was it before 2004?
13  A. I honestly do not recall what date.
14  Q. Was it more than two years ago?
15  A. I do not recall what date I first saw
16  Mr. Tyrrell's patent.
17  Q. Have you read the patent?
18  A. In parts, I have read the patent.
19  Q. But you've seen the pictures, haven't you?
20  A. I have seen the patent, yes, sir.
21  Q. Do you sell any products that look like the
22  figure on the front page of United Stated Patent
23  No. 6,435,188?
24  A. Not products with clips.

17 (Pages 62 to 65)

66

1   Q. So where are you pointing? Can you describe
2   where you're pointing?
3   A. To this. Would be in the area where the
4   arrow from Item 52 is directed on the patent.
5   Q. You're saying none of your products have that
6   clip feature?
7   A. Correct, in a head mobilization system.
8   Q. But you use that clip feature --
9   A. For straps for the patient's body as it's
10  been in the marketplace before I was licensed.
11  Q. Do you use a crisscrossing pattern for head
12  immobilization in any of your products?
13  A. That is left to local protocol and local
14  scene determined by the technician involved.
15  Q. You can either clip them in in a parallel
16  form or crisscross them; is that correct?
17  A. Sure.
18  Q. What in this figure on the front of
19  Exhibit 1, was, in your opinion, already
20  existing?
21  A. The backboard itself was already existing.
22  Q. The backboard with that exact configuration
23  of holes?
24  A. There are many manufacturers of backboards

67

1   and there are many configurations of hand holds
2   depending on the type of board.
3   Q. But do you know whether that particular
4   configuration of holes around the head was
5   already existing?
6   A. I do not. I could not specifically say to a
7   particular product. Our products had slots and
8   hand holds. I mean, generally, the more hand
9   holds you have, the better competitor advantage
10  you have.
11  Q. Now, are the speed clips that you were
12  referencing earlier on this figure?
13  A. Yes, they are. The strap with the speed clip
14  was our interest.
15  Q. Have you ever sold a head immobilization
16  system with a speed clip?
17  A. We have not.
18  Q. Why not?
19  A. We introduced, we test-marketed it, and there
20  was not an interest from the market as we
21  previously stated.
22  Q. Do you sell any products with head blocks in
23  this shape?
24  A. Yes, we do.

68

1   Q. Did you sell them before March of 2000?
2   A. Yes, we did.
3   Q. Do you recall what products those were?
4   A. Our Soft Loc immobilization system.
5   Q. Are those single use blocks?
6   A. That product is a multi-use product. We also
7   have a product called the Foam Loc, which was the
8   disposable version of the Soft Loc.
9   Q. Do you have head block systems where you can
10  substitute a rolled up towel for the head block?
11  A. That would be left to local technician's
12  discretion.
13  Q. Do you have head immobilization systems that
14  can accommodate a neck brace?
15  A. They all would, in nature.
16  Q. Do you sell head immobilization systems that
17  are integrated with the body immobilization
18  systems so you can tip the boards on their side
19  without --
20  A. We do not have a --
21  Q. Let me just finish. So that they can be
22  tipped on their side without creating any
23  movement for the patient?
24  A. We do not. Generally, clinical practice is

69

1   you mobilize a patient's body and then their head
2   separately, so that in the event that while you
3   are immobilizing the patient and the patient
4   should aspirate, you could roll the patient to
5   remove any vomitus or anything of that nature.
6   So you wouldn't want to have the head and the
7   body connected.
8   Q. Why not?
9   A. When a patient is injured and they're lying
10  on their back and you slide them onto a
11  backboard, you want to immobilize their body
12  first. Because if during the course of the
13  immobilization, the patient should vomit and
14  they're lying on their back, you do not want that
15  to go into their airway. So if their body is
16  done first, you can hold the head manually and
17  rotate the board so that you can remove the
18  vomitus from their airway.
19  Q. If, though, they were integrated, head and
20  body, couldn't you just tip the board?
21  A. You would tip the board in either manner.
22  Fact is, we do not sell a single immobilization
23  product that immobilizes head and body at the
24  same time.

18 (Pages 66 to 69)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc.. d/b/a Iron Duck

---

70

1  Q. Is it your understanding that Mr. Tyrrell's
2  patent was for a single unitary immobilization
3  product?
4  A. No, it was not. My interpretation of
5  Mr. Tyrrell's products was that his idea was
6  speed clips at the head of the -- using speed
7  clips for the straps to immobilize the head to
8  aid in speeding up the immobilization process.
9  Q. Are you aware of any product in the market
10  that has a unitary immobilization feature for the
11  entire body, head and torso?
12  A. Not to my knowledge, sir.
13  Q. You don't think it's viable?
14  A. Current clinical practice would say
15  otherwise.
16  Q. What -- do you think, as a marketer of
17  product in this industry, would such an idea be
18  viable?
19  A. Potentially.
20  Q. Figure 5 shows two different types of clips,
21  Number 60 and 62. What types of clips are those?
22  A. That's what's commonly referred to as a
23  swivel snap hook.
24  Q. Number 70 and 72?

---

71

1  A. Appear, to me, to be a side release buckle.
2  Q. And Number 34 in Figure 4, what kind of
3  hardware is that?
4  A. That would appear to be a pin placed in a
5  cross-section of a backboard.
6      MR. McCARTHY: Could I ask him to
7  take another look at that because I don't
8  think that's where that line goes.
9      THE WITNESS: That could be the
10  head of the clip.
11      MR. McCARTHY: But the line --
12      MR. WEINER: He's got to testify.
13      THE WITNESS: It appears that
14  there's a little confusion in the line,
15  whether the line marries up, what appears
16  to me, to be with the swivel snap hook.
17  So I would say it's really unclear.
18  Q. (By Mr. Weiner) You refer earlier to speed
19  clips?
20  A. Mm-hmm.
21  Q. Is this what you're referring to, Figure 4?
22  A. A speed clip and a swivel snap hook are
23  interchangeable terms.
24  Q. That's why I was confused. So this Figure 4

---

72

1  shows the head immobilization segment of the
2  product and a blow-up, presumably, of one of the
3  clip areas; would you agree with that?
4  A. That would appear to be what's before me.
5  Q. That is what you understand to be a speed
6  clip?
7  A. The swivel snap hook. The clip itself,
8  what's clearly identified on here as Item 60 is
9  the clip.
10  Q. And the pin, is that numbered -- is that
11  Number 34?
12  A. It's really unclear now that I look at it a
13  second time. It could be 34. It could be the
14  clip itself.
15      MR. WEINER: I'd like to mark this
16  as the next exhibit please.
17      (Exhibit-2, Confidential
18  Disclosure Agreement, marked for
19  identification.)
20  Q. (By Mr. Weiner) Sir, I'm showing you Exhibit
21  2 which is identified as Confidential Disclosure
22  Agreement, have you seen this before?
23  A. I have.
24  Q. Is that your signature at the bottom of the

---

73

1  document?
2  A. It is.
3  Q. Is that dated on your birthday in the year
4  2000?
5  A. That is correct; 29 March.
6  Q. Do you see anything about test marketing in
7  this document?
8  A. I do not.
9  Q. Likewise, do you see anything about sending
10  samples to parties other than the parties
11  identified in the agreement?
12  A. I do not. That was our verbal arrangement.
13  Q. When you say "verbal," do you mean oral?
14  A. Oral.
15  Q. Non written?
16  A. Non written. Sorry.
17  Q. At the bottom of this document it indicates
18  that disclosee agrees to review the disclosure
19  and notify the discloser within ten days if
20  disclosee wishes to obtain an interest in, or
21  provide services for, the subject matter of the
22  disclosure. Did I read that correctly?
23  A. Yes, you did, sir.
24  Q. Did you understand that you, as a

---

19 (Pages 70 to 73)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

---

74

1  representative of Iron Duck, was the disclosee?
2  A. Yes.
3  Q. Did you get back to Mr. Tyrrell within ten
4  days?
5  A. I believe that we executed that at the time
6  of our meeting, that we had an interest moving
7  forward.
8  Q. At the time of your meeting, you signed the
9  confidentiality agreement, correct?
10  A. That's correct.
11  Q. But after the meeting, did you get back to
12  him with whether or not he wanted to go forward?
13  A. That was done during the meeting. At the
14  conclusion of our meeting, we said that's how we
15  were going to proceed.
16  Q. But did you acquire an interest in his
17  product at that time?
18  A. I had a personal interest in that we needed
19  to show it to the marketplace to gauge a
20  worldwide or a global interest in the product.
21  Because I think it's a good idea, doesn't mean
22  anything.
23  Q. "Interest," in the context of this statement,
24  which I just read, I think means an ownership

---

75

1  interest?
2       MR. McCARTHY: Objection; the
3  document speaks for itself.
4  Q. (By Mr. Weiner) Did you obtain an ownership
5  interest in his product at any time?
6  A. I was interested in the product.
7       MR. McCARTHY: Just answer the
8  question. That's a yes or no.
9       THE WITNESS: I'm sorry. Restate
10  the question.
11  Q. (By Mr. Weiner) Did you obtain ownership
12  interest in the product at any time?
13  A. No, because it would be a royalty agreement.
14  He would maintain possession of the property.
15  Q. Did you tell him, within ten days, whether or
16  not you were interested in his property?
17       MR. McCARTHY: Objection; asked
18  and answered.
19       MR. WEINER: I don't think so.
20  Because I think interest was -- there was
21  some confusion about the word "interest".
22       MR. McCARTHY: He said he told him
23  that day, after they signed -- as they
24  were signing this thing, that he was

---

76

1  interested in doing a marketing process
2  within the Iron Duck. That's what this
3  agreement says, I would submit. That
4  would be providing services for the
5  discloser.
6  Q. (By Mr. Weiner) Did you tell Mr. Tyrrell, yes
7  or no, we're interested in -- yes or no, we are
8  going to acquire an element of your property?
9  A. No.
10  Q. Did you tell him whether or not you were
11  going to provide services in connection with his
12  property within ten days of signing this
13  agreement?
14  A. We, at the conclusion of the meeting, said
15  that we would evaluate the product by soliciting
16  information from our distributors and the
17  marketplace.
18       MR. WEINER: Would you mark that
19  as the next exhibit please.
20       (Exhibit-3, E-mail, marked for
21  identification.)
22       MR. McCARTHY: If we're moving on
23  to another document, can we take a break.
24       (Off the record.)

---

77

1       (A recess was taken.)
2       MR. WEINER: Back on.
3  Q. (By Mr. Weiner) Looking at number 3, do you
4  recall seeing that document?
5  A. I recall seeing it recently in reviewing the
6  files. I don't recall the date it arrived.
7  Q. Do you think that you saw it before your most
8  recent review?
9  A. I mean, that's very clear I have a reply
10  above his inquiry.
11  Q. Did you investigate his allegations in this
12  e-mail?
13  A. I don't recall exactly when the allegation
14  was investigated.
15  Q. Did you or someone of your direction
16  investigate these allegations?
17  A. Yes, but I don't know what the exact time or
18  date that the investigation was undertook. It
19  would have been myself.
20  Q. Did you discuss the findings of your
21  investigation with Mr. Tyrrell?
22  A. I do not recall speaking with Mr. Tyrrell.
23  Q. Did you communicate with him in any other
24  fashion?

20 (Pages 74 to 77)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

78

1 A. I requested him to call me. I don't recall
2 him returning my request to be called.
3 Q. Would you agree it's a pretty serious
4 allegation if someone says that you're violating
5 their patent? How did you respond to this?
6 A. I believe my response was on the top where I
7 asked him to phone me.
8 Q. What else, if anything, did you do in
9 response to this?
10 A. I do not recall my specific actions -- I'm
11 sorry, what's the date of that -- in October of
12 2002.
13 Q. Can you describe the Ultra-Vue backboard that
14 he was complaining about?
15 A. The Ultra-Vue is a product that we've had in
16 our product line for the entire tenure that I've
17 been at Iron Duck.
18 Q. What about the disposable Head Loc-Velcro?
19 A. That's a product that has also been -- the
20 Velcro version of that has been in our product
21 line for many years.
22 Q. What was the Disposable Head Loc-quick clip
23 included in any of Iron Duck's products?
24 A. That would have been during the test-market

79

1 period after meeting with Mr. Tyrrell.
2 Q. After the test-market period, was it included
3 in any of your products?
4 A. We would have supported it with a web
5 presence so that customers, as you talk to a
6 customer you're trying to gauge some interest,
7 you have an avenue to discuss it with a
8 distributor or a field rep.
9 Q. So as part of your test marketing, you say
10 that you also put it on your web?
11 A. That's correct. I mean, that would be only
12 the fair thing to do to adequately test the
13 product.
14 Q. You also trained some of your people in the
15 product so that they could discuss it
16 intelligently?
17 A. Of course.
18 Q. After the test period, did you remove it from
19 your website?
20 A. I believe that that was a lapse in
21 management, that it was not removed from the
22 website after the test period.
23 Q. Is it still on the website?
24 A. It is not.

80

1 Q. When was it finally removed?
2 A. I do not have a specific date.
3 Q. So that Disposable Head Loc-quick clip was on
4 your website from shortly after March of 2000
5 until it was finally removed within the last year
6 or two?
7 A. No, I believe that it was removed once these
8 concerns were raised and it was through the
9 investigation process.
10 Q. Were any other products associated with
11 Mr. Tyrrell's samples included on the website?
12 A. His only product was the head block and strap
13 system.
14 Q. So there was one product on the website?
15 A. That's correct. That was the -- I believe
16 the Foam Loc-quick clip, I think is how it was
17 identified.
18 Q. So in addition to e-mailing him back, which
19 appears over your name on Exhibit 3, you had the
20 Disposable Head Loc-quick clip removed from the
21 website, correct?
22 A. I don't know the exact date that that was
23 removed from the website. I believe that he
24 makes -- if I could see that document -- he is

81

1 making that allegation. So I would say that it
2 would have been investigated at that time.
3 Q. But you don't know for sure?
4 A. I don't know the specific date it was
5 removed, sir.
6 MR. WEINER: Let's mark this as the next
7 exhibit please.
8 (Exhibit-4, Letter Dated 4-21-03, marked
9 for identification.)
10 Q. (By Mr. Weiner) Have you ever seen this
11 letter?
12 A. I have.
13 Q. Did you conduct the investigation for
14 Mr. Fleming referenced in the letter?
15 A. I would have done that. That would have been
16 my responsibility.
17 Q. Now this indicates that Mr. Tyrrell made
18 another complaint in December of '03; do you
19 recall that?
20 A. That's what's stated on the document before
21 me.
22 Q. Do you know whether his product was removed
23 from the website by that time?
24 A. Again, I don't know the specific date that

21 (Pages 78 to 81)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

| 82 | 84 |
|---|---|
| 1 that product was removed from the website. | 1 A. That's the BASE Board. |
| 2 Q. Did you conduct an additional investigation | 2 Q. What do you mean by BASE Board? |
| 3 in response to that December 2003 letter? | 3 A. That's the name of the product BASE Board. |
| 4     MR. McCARTHY: Can you tell me | 4 Q. What's Number 3? |
| 5 what December 2003 letter? | 5 A. That was a product that we briefly |
| 6     MR. WEINER: There's a reference | 6 manufactured for Dyna-Med until then they |
| 7 in the first line of this of Exhibit 4 – | 7 basically copied our design. |
| 8 I'm sorry, to his letter of 12-11-03. | 8 Q. What's it called? |
| 9     MR. McCARTHY: Okay. Exhibit 4 is | 9 A. Dolphin II Spine Board. |
| 10 dated 4-21-03, isn't it? | 10 Q. Who's Dyna-Med? |
| 11     MR. WEINER: I'm just quoting you | 11 A. They're one of our distributors. |
| 12 what it says in this letter. | 12 Q. Did you take any action against them for |
| 13 Q. (By Mr. Weiner) First you had the e-mail, | 13 copying your design? |
| 14 correct, that was Exhibit 3? | 14 A. Our design was not patented. Other than |
| 15 A. That's my recollection. | 15 they're not much a favored nation status anymore. |
| 16 Q. That was October of 2002? | 16 Q. Did you investigate whether these three |
| 17 A. Yes. | 17 identified products violated Mr. Tyrrell's |
| 18 Q. Was there a follow-up letter from him making | 18 patent? |
| 19 substantially the same complaints? | 19 A. We certainly did look into that. We were |
| 20 A. Not to my knowledge. | 20 perplexed as to why the claim to the backboard. |
| 21 Q. Do you know what Mr. Fleming was responding | 21 Q. Have those backboards been offered for sale |
| 22 to through Exhibit 4? | 22 – strike that. Were these backboards offered |
| 23 A. I do not. It references here a copy of a | 23 for sale prior to March of 2000? |
| 24 letter that was sent to you on 12-27-03. | 24 A. I can't specifically speak to the Dolphin II |

| 83 | 85 |
|---|---|
| 1 Q. Assuming that that's a typographical error | 1 but the other two boards did exist prior to of |
| 2 and they mean '02, do you recall any follow-up | 2 March of '02. I do not know their exact |
| 3 letters from Mr. Tyrrell making substantially the | 3 introduction dates. |
| 4 same complaints about patent infringement? | 4 Q. Were they modified in any way after March of |
| 5 A. Not directly through Mr. Tyrrell. Obviously, | 5 2000? |
| 6 Attorney McGonagle had contacted our offices. | 6 A. The Ultra Space Save board has had a redesign |
| 7 Q. How many times did you investigate these | 7 over the – in the last five years. |
| 8 allegations of patent infringement? | 8 Q. What's the nature of that redesign? |
| 9 A. Once, to my recollection. | 9 A. We made it look more like -- the original |
| 10     MR. WEINER: Can we have this | 10 product was -- we recycled an old tool so we |
| 11 marked as the next exhibit. | 11 improved the weight capacity, so there was some |
| 12     (Exhibit-5, Letter Dated January | 12 engineering changes to the strength and |
| 13     14, 2005, marked for identification.) | 13 durability of the product. |
| 14 Q. (By Mr. Weiner) Have you ever seen Exhibit 5 | 14 Q. Were the holes moved? |
| 15 which is a January 14, 2004 letter from Salter & | 15 A. There were some differences in hand hold |
| 16 Michaelson? | 16 placement. We added a taper to the board which |
| 17 A. Yes, I have seen this. | 17 is what the market had asked us to do. |
| 18 Q. And that letter references three different | 18 Q. Were any pins added to the board? |
| 19 products that the lawyer contends violate the | 19 A. We had standard pin configuration. The pins |
| 20 patent. Do you know what these products are, the | 20 are placed at the request of the end user. We do |
| 21 Ultra Spac-Sav, it's Number 1, what is that? | 21 custom pin configuration as well as standard pin |
| 22 A. That is our Ultra Space Save folding plastic | 22 configuration. So a customer can request a pin |
| 23 backboard. | 23 wherever they would like and we charge them |
| 24 Q. What is Number 2? | 24 accordingly. |

22 (Pages 82 to 85)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries. Inc.. d/b/a Iron Duck

86

1    Q. Were any of the pin configurations the same
2    as Mr. Tyrrell's patent?
3        MR. McCARTHY: Objection.
4    Q. (By Mr. Weiner) Were they located the same --
5    in the same places?
6        MR. McCARTHY: Objection.
7    Mr. Lawrence is not here as a patent
8    expert.
9        MR. WEINER: No, but he's a
10   product expert.
11       MR. McCARTHY: He doesn't know
12   what Mr. Tyrrell's patent claims and he's
13   not here to testify about that.
14   Q. (By Mr. Weiner) Were any of the modifications
15   to that product related to speed clips?
16   A. No, not directly. They were weight capacity,
17   taper. It was second evolution of the product.
18   Because primarily we wanted to be able to put it
19   into a stokes basket, so it needed to have a
20   taper on the foot end.
21       MR. WEINER: Can you mark this please.
22       (Exhibit-6, Advertisement, marked
23   for identification.)
24   Q. (By Mr. Weiner) Can you tell me what Exhibit

87

1    6 is?
2    A. Reads Disposable Foam Head Loc-Quick Clip.
3    Q. Is that Mr. Tyrrell's product?
4    A. That it is, sir.
5    Q. Is that the way it appeared on your website?
6    A. It would appear to be a direct print from our
7    website.
8    Q. Do you sell any products that have the same
9    characteristics as this one?
10   A. We sell a Velcro version of the same product
11   that does not have the quick clips.
12   Q. What product do you sell with quick clips?
13   A. Nothing for head immobilization system, no.
14   Q. What products do you sell with quick clips?
15   A. We have body straps used to immobilize the
16   patient's body that utilize speed clips.
17   Q. What products are those?
18   A. Just immobilization strap with a speed clip.
19       MR. WEINER: Mark this please.
20       (Exhibit-7, Advertisement, marked
21   for identification.)
22   Q. (By Mr. Weiner) Can you tell me what Exhibit
23   7 is?
24   A. It's a document. It says Ultra-Vue

88

1    Backboard.
2    Q. Is that the Ultra-Vue Backboard that you
3    referred to earlier in the deposition?
4    A. That's correct. This is the 16 inch wide
5    version.
6    Q. Not the Ultra-Vue 18?
7    A. That's correct.
8    Q. Was this product sold prior to March 2000?
9    A. Yes, sir.
10   Q. Has it changed any?
11   A. It has not.
12   Q. I'm not going to mark this as an exhibit. Is
13   that really you?
14   A. That's me.
15       MR. WEINER: Can you mark this.
16       (Exhibit-8, Advertisement, marked
17   for identification.)
18   Q. (By Mr. Weiner) Can you tell me what Exhibit
19   8 is?
20   A. That's our Ultra-Vue Spac-Sav Plastic
21   Backboard.
22   Q. Has that changed since March of 2000?
23   A. I'm not exactly sure when we did the redesign
24   of that product, what the timeline is on that.

89

1    But that's been the product that's been in the
2    marketplace for some time now.
3    Q. Again looking at the photograph, where was
4    the design changed?
5    A. The pins -- I'm sorry. The taper on the foot
6    end of the backboard, and then we made these
7    openings here to look more unison with our other
8    products.
9    Q. You're pointing to --
10   A. Kiss offs --
11   Q. The four rectangular --
12   A. Actually, I'm looking at the openings along
13   the side. All of these openings, this is where
14   we would place pins.
15   Q. So the smaller rectangular openings?
16   A. Correct. And we do place pins at customer's
17   request in any opening that they would like.
18   Q. Could you mark on that, just so we understand
19   later, which are the openings designed for pins?
20   A. They all are, with the exception of the
21   openings in the center.
22   Q. So everything along the outside?
23   A. We do place pins --
24   Q. Why don't you do arrows to those.

23 (Pages 86 to 89)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

90

1     A. (Witness complying.)  You want me to do them
2     all?
3     Q. So you're referring to the small ones and the
4     large ones?
5     A. Small and large, sir.  It's up to customers.
6     And in the past, we've put pins in here as well.
7     Q. That last reference was to the head and the
8     foot of the board?
9     A. The carry positions, if you will.
10     Q. Those aren't for the hands of the EMT?
11     A. They are but they often will put pins in them
12     so that they have -- in a time of care, some
13     agencies request to have custom configurations
14     done so that they could deal with a particular
15     issue; and it really comes down to personal
16     preference.
17         MR. WEINER:  Mark that next
18     please.  Why don't we make this all one.
19     Add those pages to the back of that one
20     please.
21         (Exhibit-9, Advertisement, marked
22     for identification.)
23     Q. (By Mr. Weiner) Showing you Exhibit 9, can
24     you tell me what that is please?  Take a look at

91

1     all the pages.
2     A. The top page appears to be an introductory
3     tear sheet for the Ultra-Vue 18.  The second page
4     appears to be the Ultra-Vue board on one of my
5     dealer's websites.  And the third page appears to
6     be just product listings for various models and
7     colors -- configurations and colors of the
8     Ultra-Vue product.
9     Q. Again, the difference between this and the
10     original Ultra-Vue is expanded width?
11     A. That's correct.  One is 16 inches wide, the
12     original product, and this is an 18-inch product.
13     Q. Do you remember when this was introduced?
14     A. I do not.
15         MR. McCARTHY:  Can I interject.  I
16     don't like to keep doing this.  The first
17     page is the Ultra-Vue 18.  The other page
18     is the basic Ultra-Vue.
19         MR. WEINER:  You're right.  They
20     should be separate.  I'm going to
21     separate the top page of 9 from the other
22     pages and mark them separately.
23     Q. (By Mr. Weiner) We're just dealing with that
24     Ultra-Vue tear sheet.

92

1     A. Exhibit 9.  It appears to be an Ultra-Vue 18
2     and also our Foam Velcro Head Immobilization
3     systems.
4     Q. Other than the width, are there any other
5     differences between this and the other Ultra-Vue?
6     A. None.
7     Q. Did this come out within the last five or six
8     years?
9     A. I do not know the specific date, but in
10     general terms, yes.
11     Q. You think within the last five years?
12     A. Yes.
13         MR. WEINER:  Mark this one next please.
14         (Exhibit-10, Advertisement, marked
15     for identification.)
16     Q. (By Mr. Weiner) Showing you what's been
17     marked as Exhibit 10, can you tell me what that
18     is please?
19     A. That is our Ultra-Vue 16-inch wide product
20     from AllMed.net.  The second page is the board
21     with various different colors that we offer along
22     with different quantities of pins in the board.
23     Q. Would you agree that that indicates that the
24     pins can be purchased with the board in different

93

1     quantities?
2     A. That's what it does indicate, yes.  That's --
3     pin placement is, again, really just specific to
4     local protocol or, really, preference.
5     Q. Are these pins designed to be used with speed
6     clips?
7     A. Correct, along the patient's body.
8         MR. WEINER:  Mark that one please.
9         (Exhibit-11, Advertisement, marked
10     for identification.)
11     Q. (By Mr. Weiner) Could you tell me, please,
12     what Exhibit 11 is?
13     A. It appears to be a catalog page; page 9 from
14     a Dyna-Med catalog.
15     Q. What product is featured on that page?
16     A. It does say the Dolphin II Spine Board.
17     However, I do not know if we manufactured that
18     product or if that's the product that they
19     copied.  The front is identical; however, the
20     thickness in the back is different, and that's
21     not pictured in what's before me.
22     Q. Does that indicate that it comes with or
23     without pins?
24     A. Yes, it does.

24 (Pages 90 to 93)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises. Inc. v. Fleming Industries. Inc., d/b/a Iron Duck

94

1  Q. Does it say in the narrative, available with
2  or without speed-clip pins?
3  A. It says available with or without speed-clip
4  pins and the word "orange". So that would likely
5  be referring to the body mobilization system.
6  Q. When did you start making the Dolphin II?
7  A. I do not know the specific date.
8  Q. Was that within the last five years?
9  A. It would have been -- I do not recall. We
10  basically private labeled our product for them.
11  Q. Did that happen while you were employed at
12  the company?
13  A. Yes.
14  Q. It wasn't preexisting when you got there?
15  A. No, it was not. I negotiated the deal.
16     (Exhibit-12, Tyrnel Head Restraint
17  System, marked for identification.)
18  Q. (By Mr. Weiner) Have you ever seen Exhibit
19  12?
20  A. I have not.
21  Q. Does Iron Duck sell the products pictured in
22  Exhibit 12?
23  A. What's before me appears to be Mr. Tyrrell's
24  head restraint system with a strap with a pad and

95

1  the swivel snap hook and a head block that I've
2  not seen -- that we do not produce.
3  Q. Do you sell any of the products depicted on
4  Exhibit 12?
5  A. We do not. Our Velcro head block -- this
6  appears -- the block appears to be a baggy of
7  some sort with something in it. We do not sell
8  anything like that.
9  Q. What about the straps?
10  A. The straps, we do not sell anything. That
11  appears to be Mr. Tyrrell's device.
12     MR. WEINER: Mark that next please.
13     (Exhibit-13, Document, marked for
14  identification.)
15  Q. (By Mr. Weiner) Take a look at this text and
16  let me know if you've ever seen it before?
17  A. I don't ever recall seeing this
18  document.
19     MR. WEINER: It's a narrative
20  describing the product.
21     MR. McCARTHY: What product?
22     MR. WEINER: Describing the
23  Tyrrell product.
24     MR. McCARTHY: Can you, at least

96

1  for the record, identify it since it's
2  been marked because he's never seen it
3  before and neither have I, so.
4     MR. WEINER: This is an unsigned,
5  undated narrative, three pages, and two
6  lines at the fourth page which describes
7  immobilization systems and has some
8  references to the Ferno line of
9  backboards.
10     (Exhibit-14, Letter Dated August
11  30(b)6, 2004, marked for identification.)
12  Q. (By Mr. Weiner) Have you seen this letter
13  before?
14  A. I have. It's a letter from, I believe
15  Mr. Salter to Deb Basile from the firm that
16  represents...
17  Q. Did you look into the specific
18  allegations?
19     MR. McCARTHY: Objection, don't
20  answer. That question is subject to
21  attorney/client privilege, whatever he
22  did with a letter that came through
23  counsel.
24  Q. (By Mr. Weiner) Have you seen the Matrx 2003

97

1  catalog?
2  A. Yes.
3  Q. Do you know whether you've seen these
4  products in that catalog?
5  A. I would have seen them, as they are my
6  products in my distributor's catalog.
7  Q. And you're familiar with the Alliance 2003
8  guide?
9  A. I'm aware of Alliance's catalog. I don't
10  have specific recollection of looking at that
11  year's catalog.
12  Q. Are you familiar with the Galls 2003 buyer's
13  guide?
14  A. I'm familiar with Galls, with their buyer's
15  guides. I don't specifically remember that
16  particular catalog.
17     MR. McCARTHY: Can you just
18  describe for the record what Exhibit 14
19  is?
20     MR. WEINER: I'm sorry. 14 is a
21  letter dated August 30, 2004 from Robert
22  Salter to Deborah Basile.
23  Q. (By Mr. Weiner) At some point in 2004, did
24  you have discussions with Mr. Tyrrell or his

25 (Pages 94 to 97)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

98

1  representatives regarding a licensing agreement?
2  A. We have had a conversation about a licensing
3  agreement. I cannot speak as to what year that
4  was.
5  　　　MR. WEINER: Maybe this will help.
6  Let's mark this. This is a May 10, 2004
7  letter from your production of documents.
8  　　　MR. McCARTHY: It's not in this
9  pile though.
10  　　　MR. WEINER: Not in that pile.
11  　　　(Exhibit-15, Letter Dated May 10,
12  2004, marked for identification.)
13  Q. (By Mr. Weiner) Have you seen this letter,
14  Exhibit 15?
15  A. Yes, sir, I have.
16  Q. Does that refresh your recollection as to the
17  time period when you were discussing a potential
18  license agreement?
19  A. A license agreement is mentioned in this
20  letter and it's May 10th of 2004.
21  Q. Did you have any conversations about a
22  license agreement with Mr. Tyrrell at or about
23  that time?
24  A. Not directly Mr. Tyrrell with -- and we did

99

1  not speak with the attorney who's documented, via
2  letter, fax, and U.S. Postal Service.
3  　　　MR. WEINER: Mark this as the next
4  exhibit, please.
5  　　　(Exhibit-16, Letter Dated April
6  16, 2004, marked for identification.)
7  Q. (By Mr. Weiner) Have you seen Exhibit 16?
8  A. I believe this is what we -- yes, I have.
9  Q. What is it?
10  A. It would appear to be an outline of said
11  marketing or distribution royalty agreement.
12  Q. Who wrote that?
13  A. Myself.
14  　　　MR. WEINER: Mark this as the next
15  exhibit. Actually, I want to -- this one
16  has a fax logo at the top. I'm going to
17  put this one into the record. I don't
18  know why the photocopy -- it may have cut
19  it off. Unless you want to stop the
20  deposition and get another copy of this.
21  　　　MR. McCARTHY: No, that's all
22  right.
23  　　　(Exhibit-17, Advertisement, marked
24  for identification.)

100

1  Q. (By Mr. Weiner) Have you seen this before?
2  A. Yes, I have.
3  Q. This is Number 17, what is that?
4  A. This accompanied -- I believe this
5  accompanied the letter.
6  Q. Which letter?
7  A. The letter dated April 16th as part of our
8  attempt to come to some resolution in which we
9  put some energy into providing a proposed
10  advertisement to Mr. Tyrrell along with this
11  package. As it states on here Proposed
12  Advertisement 4/16/04.
13  Q. Did the parties reach an agreement?
14  A. We did not.
15  Q. Do you recall why?
16  A. Actually, no.
17  Q. Is there more correspondence related to this
18  exchange that I don't have here?
19  A. I do not have specific knowledge of a
20  specific document.
21  　　　MR. McCARTHY: Want to go off the
22  record for a second.
23  　　　MR. WEINER: Sure.
24  　　　(Off the record.)

101

1  　　　(An off-the-record discussion
2  was held.)
3  　　　MR. WEINER: Back on the record.
4  Q. (By Mr. Weiner) So no licensing agreement was
5  agreed upon?
6  A. No, it was not.
7  Q. Have there been any subsequent discussions
8  about a licensing agreement?
9  A. I believe there has been some correspondence
10  through our attorneys.
11  Q. Are there any present proposals for a
12  licensing agreement?
13  A. I believe there is currently an offer on the
14  table. However, I do not know if there's any
15  resolution to that; if that was rejected or --
16  Q. Who was the offer from?
17  A. It was obviously from us --
18  Q. Are you referring to Mr. McCarthy's
19  settlement offer?
20  A. Correct.
21  Q. But there's no licensing proposal currently
22  on the table?
23  A. I do not recall at this time, with all the
24  back and forth. I've -- I'm not exactly sure of

26 (Pages 98 to 101)

102

1  the time line at this point.
2      MR. WEINER: I have nothing
3  further. With respect to the exhibits --
4      MR. McCARTHY: Why don't we go off
5  the record for a second.
6      (Off the record.)
7      (An off-the-record discussion
8  was held.)
9      MR. McCARTHY: Back on. One,
10  Mr. Lawrence will read and sign. Two,
11  subject to our earlier discussion about
12  reserving rights to either have Mr. --
13  either us to produce Mr. Lawrence again
14  for other reasons or for you to insist on
15  his appearance without the need for the
16  court to extend the time of taking this
17  deposition. So we're suspended to those
18  limitations.
19      MR. WEINER: We are suspended
20  today. This is a 30(b)6 deposition of
21  the company. We reserve the right to
22  recall Mr. Lawrence if the court gives us
23  latitude about questions that are
24  appropriate. And, if necessary, to call

103

1  Mr. Fleming or other personnel at the
2  company regarding other areas of inquiry
3  that have been objected to.
4      MR. McCARTHY: You can send it to
5  me; I'll send it to Mr. Lawrence. Can
6  you send me a mini and a disk?
7
8      (Witness excused.)
9      (Deposition suspended at 12:44 p.m.)
10      (Exhibits 1 through 17 were marked in
11  today's proceeding.)
12
13
14
15
16
17
18
19
20
21
22
23
24

104

1  COMMONWEALTH OF MASSACHUSETTS    HAMPDEN. SS.
2      I, Jennifer Powis, a Certified Verbatim
3  Reporter and Notary Public duly commissioned and
4  qualified in and for the Commonwealth of
5  Massachusetts, do hereby certify that there came
6  before me on the 30th day of March, 2006, at
7  10:06 a.m., the person hereinbefore named, BROOKE
8  LAWRENCE, who provided satisfactory evidence of
9  identification as prescribed by Executive Order
10  455 (03-13) issued by the Governor of the
11  Commonwealth of Massachusetts, was by me duly
12  sworn to testify to the truth and nothing but the
13  truth of his knowledge touching and concerning
14  the matters in controversy in this cause; that he
15  was thereupon examined upon his oath, and his
16  examination reduced to typewriting under my
17  direction; and that this is a true record of the
18  testimony given by the witness to the best of my
19  ability.
        I further certify that I am neither attorney
20  or counsel for, nor related to or employed by,
    any of the parties to the action in which this
21  deposition is taken, and further, that I am not a
    relative or employee of any attorney or counsel
22  employed by the parties hereto or financially
    interested in the action.
23  My Commission Expires:
    June 10, 2011
24      JENNIFER POWIS

105

1      ERRATA SHEET DISTRIBUTION INFORMATION
2      DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4      ERRATA SHEET DISTRIBUTION INFORMATION
5
6      The original of the Errata Sheet has been
7  delivered to John McCarthy, Esquire.
8      When the Errata Sheet has been completed by
9  the deponent and signed, a copy thereof should be
10  delivered to each party of record and the
11  ORIGINAL forwarded to Harris K. Weiner, Esquire,
12  to whom the original deposition transcript was
13  delivered.
14      INSTRUCTIONS TO DEPONENT
15
16      After reading this volume of your
17  deposition, please indicate any corrections or
18  changes to your testimony and the reason therefor
19  on the Errata Sheet supplied to you and sign it.
20  DO NOT make marks or notations on the transcript
21  volume itself. Add additional sheets if
22  necessary. Please refer to the above
23  instructions for Errata Sheet distribution
24  information.

27 (Pages 102 to 105)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

106

1    PLEASE ATTACH TO THE DEPOSITION OF
2    BROOKE LAWRENCE
3    CASE:  TYRNEL INDUSTRIES, INC. VS. FLEMING
4    INDUSTRIES INC.
5    DATE TAKEN:  MARCH 30(b)6, 2006
6         ERRATA SHEET
7    Please refer to page 105 for Errata Sheet
8    instructions and distribution information.
9    PAGELINE    CHANGE       REASON
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    I have read the foregoing transcript of my
      deposition, and except for any corrections or
18    changes noted above, I hereby subscribe to the
      transcript as an accurate record of the
19    statements made by me.
20    Executed this____ day of _____, 2006.
21    _____
           BROOKE LAWRENCE
22
23
24

28 (Page 106)

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

## A

**ability** 104:19
**able** 86:18
**about** 10:15 11:21
12:11 14:18
15:21 19:23
21:4 22:5 23:20
23:24 36:10,22
38:21 39:1,7,23
40:18 43:21
45:13,14,21
47:18 48:2,4
49:2,5,7 50:4
52:12,18 53:12
53:15,21 58:11
58:13 73:6,9
75:21 78:14,18
83:4 86:13 95:9
98:2,21,22
101:8 102:11,23
**above** 77:10
105:22 106:18
**abusive** 23:18
**accept** 48:15
**accident** 62:1
**accommodate**
68:14
**accompanied**
100:4,5
**according** 41:21
**accordingly** 85:24
**account** 8:11 9:11
9:13,17 10:8
**accountant** 63:12
**accurate** 106:18
**acquire** 21:6
74:16 76:8
**acquired** 20:23
**acquiring** 20:21
**across** 10:9
**action** 1:7 84:12
104:20,22
**actions** 78:10
**active** 18:23
**actively** 25:2
36:15
**activities** 12:15
**actually** 16:8 25:5
26:2 28:20 39:9

50:15 57:18
89:12 99:15
100:16
**Add** 90:19 105:21
**added** 41:7,8,8,12
41:15 85:16,18
**addition** 80:18
**additional** 38:6
82:2 105:21
**adequately** 79:12
**admittedly** 58:24
**Advanced** 21:8
**advantage** 67:9
**advertisement**
3:12,12,13,13
3:14,14,17
86:22 87:20
88:16 90:21
92:14 93:9
99:23 100:10,12
**advertising** 59:12
**affiliated** 8:24
**affiliates** 62:23
**after** 4:5 33:16,20
36:2 50:14,16
53:16 55:5
74:11 75:23
79:1,2,18,22
80:4 85:4
105:16
**again** 30:4 45:17
81:24 89:3 91:9
93:3 102:13
**against** 29:22
84:12
**agencies** 28:15
60:19 90:13
**ago** 8:3 50:19
65:14
**agree** 23:11 31:14
31:16 44:2
46:24 72:3 78:3
92:23
**agreed** 4:2,9 44:1
44:19 101:5
**agreement** 3:10
21:1 43:14,19
43:22,24 44:7,8
72:18,22 73:11

74:9 75:13 76:3
76:13 98:1,3,18
98:19,22 99:11
100:13 101:4,8
101:12
**agreements** 23:22
48:16
**agrees** 73:18
**aid** 70:8
**airway** 39:16
69:15,18
**allegation** 54:11
77:13 78:4 81:1
**allegations** 31:5,5
34:20 77:11,16
83:8 96:18
**Alliance** 97:7
**Alliance's** 97:9
**AllMed.net** 92:20
**allow** 23:16 31:10
57:7
**along** 14:15 40:5
61:11 89:12,22
92:21 93:7
100:10
**already** 21:17
39:20 66:19,21
67:5
**always** 7:18
**ambulance** 16:18
17:12,15
**America** 28:17
62:18
**American** 17:15
18:10,14 50:20
51:5
**amount** 62:19
**and/or** 33:18,21
**another** 19:18
20:21,24 22:10
30:24 55:15
71:7 76:23
81:18 99:20
**answer** 4:15 5:21
21:13 50:8 75:7
96:20
**answered** 75:18
**answering** 5:11
**answers** 5:6 22:8

**anybody** 45:18
53:9
**anymore** 84:15
**anyone** 35:24 45:6
45:14 46:5
52:10,14,14
64:10,13
**anything** 7:7 31:4
37:20 43:23
48:24 49:1 52:4
54:19 69:5 73:6
73:9 74:22 78:8
95:8,10
**appear** 64:23 71:1
71:4 72:4 87:6
99:10
**appearance**
102:15
**APPEARANCES**
2:1
**appeared** 34:17
35:2 50:12 87:5
**appears** 71:13,15
80:19 91:2,4,5
92:1 93:13
94:23 95:6,6,11
**application** 27:2
27:16
**applying** 46:12
**approached** 50:19
**appropriate**
102:24
**approximately**
7:6 8:1,9,20
30:16 32:3
50:19 61:17
**April** 3:17 99:5
100:7
**area** 66:3
**areas** 21:23 72:3
103:2
**armpits** 62:5
**army** 7:11
**around** 8:19
40:17 62:5 67:4
**arrangement**
73:12
**arrival** 42:4
**arrived** 57:18

77:6
**arrow** 66:4
**arrows** 89:24
**articulate** 49:18
**Asia** 62:18
**asked** 5:23 75:17
78:7 85:17
**asking** 5:5 23:20
51:24 53:21
**aspirate** 69:4
**assigned** 25:3
**associate** 27:23
28:1
**associated** 80:10
**Association** 18:10
18:14
**associations** 10:24
**assume** 5:22
23:16 36:17
38:3 51:10
54:13
**assuming** 23:3
83:1
**attach** 3:19 32:18
106:1
**attaches** 33:5
**attempt** 100:8
**attempting** 22:22
**attend** 11:3
**attends** 11:6
**attorney** 27:4,15
53:18 83:6 99:1
104:19,21
**attorneys** 53:22
101:10
**attorney/client**
96:21
**audible** 5:6
**August** 3:16 96:10
97:21
**aunt** 63:13
**available** 42:15
55:3 59:4,8 94:1
94:3
**avenue** 79:7
**average** 24:9,14
**aware** 61:10 70:9
97:9
**away** 59:18

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

axes 20:18
a.m 1:22 104:7

—————————
**B**
B 2:5
back 13:3,5 31:10
  42:20 47:23
  52:4 54:2 62:4
  69:10,14 74:3
  74:11 77:2
  80:18 90:19
  93:20 101:3,24
  102:9
backboard 39:13
  41:4 62:11
  66:21,22 69:11
  71:5 78:13
  83:23 84:20
  88:1,2,21 89:6
backboards 15:6
  19:23,24 20:3
  30:12,16 31:6
  31:15,16,19
  32:6,16,18
  33:17,21 40:2
  61:18 66:24
  84:21,22 96:9
background
  13:17,19,21,23
  15:22,22
baggy 95:6
bags 14:15
ball 51:1
Baltimore 11:15
  11:19
base 35:17 84:1,2
  84:3
based 14:7 30:10
  54:11
basic 91:18
basically 7:11
  9:20 20:18
  26:16 27:8
  32:21 55:9 57:1
  84:7 94:10
Basile 27:17 96:15
  97:22
basis 23:12 24:11
  30:24

basket 86:19
batch 53:4
bear 49:23
become 8:2
before 1:17 5:11
  6:2 8:6,12 11:21
  57:18 65:8,12
  66:10 68:1 72:4
  72:22 77:7
  81:20 93:21
  94:23 95:16
  96:3,13 100:1
  104:6
behalf 1:15
behind 62:4
being 9:18 21:15
  21:16,19 25:10
  42:5 55:6
believe 16:23 31:4
  35:1 43:17 51:6
  51:23 54:6 74:5
  78:6 79:20 80:7
  80:15,23 96:14
  99:8 100:4
  101:9,13
belong 11:1
belt 33:13
best 104:18
better 17:15 38:18
  67:9
between 4:3 6:17
  9:18 33:3 44:8
  91:9 92:5
bid 60:22 61:14
bidding 60:18
  61:8
bids 61:5
big 40:17 62:3
binder 57:2
birthday 36:23
  37:9 73:3
bit 15:21
block 34:6 38:8,9
  38:10 68:9,10
  80:12 95:1,5,6
blocks 32:10 36:8
  37:22 67:22
  68:5
blow-up 72:2

board 18:23 33:5
  37:23,24,24
  40:10,12,23,24
  42:1,6,10,16
  67:2 69:17,20
  69:21 84:1,2,3,9
  85:6,16,18 90:8
  91:4 92:20,22
  92:24 93:16
boards 34:2 41:9
  68:18 85:1
body 32:17 34:24
  40:5 66:9 68:17
  69:1,7,11,15,20
  69:23 70:11
  87:15,16 93:7
  94:5
booth 12:10
both 11:7
bottom 72:24
  73:17
bounced 44:13
box 39:17,18
brace 68:14
brand 19:15
break 76:23
brief 52:20,22
briefly 84:5
bring 38:4
bringing 38:1
Brooke 1:14 3:4
  4:13 5:3 104:7
  106:2,21
brought 37:20
  38:6
buckle 33:2,3,4,5
  33:13 71:1
buddies 46:3
budget 11:18 47:3
  47:9 54:22
Building 2:6
bump 9:20
business 6:22 17:9
  30:8 55:1 62:19
  63:11,16,19
buy 59:10
buyer's 97:12,14

—————————
**C**

cage 21:5
call 22:15 52:1
  78:1 102:24
called 1:15 41:13
  63:1 68:7 78:2
  84:8
calls 24:13,15
came 16:11 19:18
  31:8 96:22
  104:5
Canada 62:18
canvas 7:12
capabilities 13:8
  24:22
capable 48:13
capacities 48:10
capacity 85:11
  86:16
car 62:1
card 59:20
cardiac 15:23
care 90:12
carry 14:11,14
  39:14 61:2,20
  90:9
carrying 21:5
case 39:14 44:15
  54:20 61:3
  106:3
cases 7:12 14:12
  14:15 61:20
casualty 15:4 21:4
  55:8
catalog 34:14 35:2
  56:24 57:20
  93:13,14 97:1,4
  97:6,9,11,16
catalogs 19:13
  34:12,15,18
  56:20,21 57:4
  57:16,18
catchy 7:13
cause 104:14
cavity 20:16
CCRI 18:11
Celona 16:24 17:3
  17:4,8,9
center 89:21
CEO 63:22

ceremony 21:21
certainly 42:24
  46:10 49:20,23
  53:3,10 55:3
  84:19
Certified 1:18
  104:2
certify 104:5,19
cetera 10:1
CFO 63:12
chain 26:17
change 34:12 36:3
  54:15,23 106:9
changed 41:4
  88:10,22 89:4
changes 33:16,20
  33:24 34:3,13
  41:10 54:16
  85:12 105:18
  106:18
changing 54:21
channels 45:19
characteristics
  87:9
charge 17:21
  85:23
check 35:9,13,14
  35:16
Chicopee 37:14
chief 64:4
China 27:12
chose 7:10
city 11:17
Civil 1:7,17
claim 84:20
claims 86:12
clarify 55:24
clarity 34:19
classes 18:17
clear 77:9
clearly 72:8
client 31:7,8
client's 15:13 34:5
  34:16 36:7
clinical 38:23
  58:10,12 68:24
  70:14
clip 32:19,20,22
  33:1,2,4,5 38:9

Brooke Lawrence 3-30-2006
Tymel Enterprises, Inc. v. Fleming Industries. Inc., d/b/a Iron Duck

40:1,7,19,21
50:3 66:6,8,15
67:13,16 71:10
71:22 72:3,6,7,9
72:14 78:22
80:3,16,20 87:2
87:18
**clipped** 32:14,16
**clips** 15:15 36:9
38:22 39:21,24
43:8 65:24
67:11 70:6,7,20
70:21 71:19
86:15 87:11,12
87:14,16 93:6
**closed** 22:14
**club** 51:3
**collaborative** 27:1
**College** 18:9
**colors** 91:7,7
92:21
**come** 20:9 24:6,9
24:10 46:16
62:5 92:7 100:8
**comes** 90:15
93:22
**commence** 5:11
**commencing** 1:22
**Commission**
104:23
**commissioned**
104:3
**commonly** 70:22
**Commonwealth**
1:19 104:1,4,11
**communicate**
77:23
**communication**
39:7
**Community** 18:9
**companies** 30:11
63:6
**company** 11:6
16:22,24 17:12
17:22 19:6
20:21,24 22:11
30:7,14 33:21
45:15 54:18
64:13,17 94:12

102:21 103:2
**comparative** 49:8
**compel** 22:7
**competencies** 39:6
**competency** 39:10
**competition** 10:11
**competitor** 31:11
67:9
**competitors** 28:23
28:24 29:8,22
31:12
**complaining**
78:14
**complaint** 31:6
81:18
**complaints** 82:19
83:4
**completed** 105:8
**compliance** 22:17
**complying** 90:1
**component** 32:11
**components** 26:15
**computerized**
35:21
**concept** 38:23
43:1
**concerning**
104:13
**concerns** 80:8
**conclusion** 74:14
76:14
**conduct** 81:13
82:2
**conference** 37:12
38:11
**Confidential** 3:9
72:17,21
**confidentiality**
74:9
**configuration**
41:3 42:6,10,17
66:22 67:4
85:19,21,22
**configurations**
67:1 86:1 90:13
91:7
**confused** 71:24
**confusion** 71:14
75:21

**connect** 40:19
**connected** 69:7
**Connecticut**
17:16
**connection** 6:8
43:14 76:11
**connects** 32:22
**contact** 36:14,14
36:18 54:16
56:10
**contacted** 36:11
36:17 53:16
83:6
**contacts** 59:5
**contain** 23:4 26:4
**contained** 23:5
31:4
**contaminate**
46:23
**contaminated**
46:23
**contends** 83:19
**context** 17:5 74:23
**continuing** 23:7
**contract** 61:8,9,13
**contractors** 8:22
**contracts** 60:18
60:20
**contribution**
26:18,24
**control** 57:13
**controversy**
104:14
**conversation** 37:7
38:21 47:1
50:22 53:9 98:2
**conversations**
51:13 52:12,15
53:6,22 98:21
**coordinator** 16:3
**copied** 84:7 93:19
**copy** 35:19 82:23
99:20 105:9
**copying** 84:13
**core** 13:7 39:5,10
39:10
**corner** 28:17
**corporate** 9:15
15:18

**corporation** 6:19
13:16
**corporations** 8:23
**correct** 5:24 6:1
8:13 15:20
16:14 18:6
19:11,19 23:22
23:23 24:2 32:6
32:7,9 35:22
36:6 37:16 41:2
42:8 44:13
48:19,20,22,23
53:16 55:23
56:7,15 58:8
64:5 66:7,16
73:5 74:9,10
79:11 80:15,21
82:14 88:4,7
89:16 91:11
93:7 101:20
**corrections**
105:17 106:17
**correctly** 73:22
**correspondence**
100:17 101:9
**cotton** 7:11
**counsel** 2:10,17
4:3 96:23
104:20,21
**countries** 62:17
**country** 11:11
55:4
**couple** 25:5 51:23
56:23
**course** 45:9 47:2
47:16 48:17
64:12 69:12
79:17
**court** 1:1 3:19
22:18 23:16,18
31:2 102:16,22
**Coventry** 17:24
**cover** 26:3
**create** 21:21 56:19
**created** 27:9
**creating** 68:22
**credible** 49:17,23
50:12
**crisscross** 66:16

**crisscrossing**
66:11
**cross-section** 71:5
**current** 11:18
13:7 70:14
**currently** 8:20
9:22 10:3 16:1
16:21 25:23
40:2 49:6 63:17
64:7 101:13,21
**curriculum** 19:1
**custom** 85:21
90:13
**customer** 79:6
85:22
**customers** 28:16
79:5 90:5
**customer's** 89:16
**cut** 99:18
**cute** 22:22
**cylindrical** 40:15
**C-shaped** 32:21

**D**

**data** 29:5 35:17
**date** 7:4 30:15
41:16 51:21
54:8 65:11,13
65:15 77:6,18
78:11 80:2,22
81:4,24 92:9
94:7 106:5
**dated** 3:11,11,16
3:16,17 73:3
81:8 82:10
83:12 96:10
97:21 98:11
99:5 100:7
**dates** 42:14,19
85:3
**day** 39:15,15
42:24 75:23
104:6 106:20
**days** 4:4 51:23
73:19 74:4
75:15 76:12
**deadlines** 22:18
**deal** 55:19,22
90:14 94:15

dealers 57:24
59:21 60:4
dealer's 91:5
dealing 16:13
31:12 91:23
Deb 96:15
Deborah 27:17
97:22
December 81:18
82:3,5
deemed 4:6
defendant 1:9
2:17 21:20
degree 23:17
delegate 35:23
delivered 105:7
105:10,13
demonstration
38:2
demonstrations
56:5
department 17:19
17:20 56:9
departments
55:20 56:6,11
depend 11:17
depending 60:1
67:2
depicted 95:3
deponent 4:4
105:9,14
DEPONENT'S
105:2
deposed 6:2
deposition 1:14
4:5,8 22:10 23:7
88:3 99:20
102:17,20 103:9
104:21 105:12
105:17 106:1,17
describe 11:5
28:13 32:20
40:3 66:1 78:13
97:18
described 40:7
describes 96:6
describing 95:20
95:22
Deshaies 18:12

design 14:23,24
26:20,22 34:16
36:7 84:7,13,14
89:4
designed 89:19
93:5
designs 14:15
34:21 60:14
detail 28:13
details 23:21
64:16
determination
29:6
determined 66:14
develop 12:18
developed 25:19
25:21,22 26:11
27:8
developing 18:24
development
12:13,16 13:6
13:13 14:8,17
24:2 26:18
device 34:9 39:16
40:6 95:11
diameter 40:18
difference 8:14
9:18,21 33:3
91:9
differences 85:15
92:5
different 39:20
70:20 83:18
92:21,22,24
93:20
differently 41:19
difficulties 21:22
direct 4:16 56:1,8
56:11,17 87:6
directed 66:4
direction 26:23
77:15 104:17
directly 19:4 55:7
61:14 64:14
83:5 86:16
98:24
director 8:7,8
9:16,18,21
30:22

disclosee 73:18,20
74:1
discloser 73:19
76:5
disclosure 3:9
72:18,21 73:18
73:22
discontinue 52:20
discontinued
53:10
discovery 21:18
22:1,8 23:5
discretion 68:12
discuss 39:9 44:3
45:22 46:2,5
48:10 50:24
53:1 77:20 79:7
79:15
discussed 22:6,21
38:17 48:24
64:10
discussing 45:21
98:17
discussion 101:1
102:7,11
discussions 43:21
97:24 101:7
disk 103:6
display 38:12
disposable 46:21
60:2 68:8 78:18
78:22 80:3,20
87:2
distribution 45:19
48:10 56:12
99:11 105:1,4
105:23 106:8
distributor 35:5,6
35:11,12 61:1
79:8
distributors 8:17
8:18,19,20,21
9:6,8 29:12
34:10,15,17
36:5 44:4 45:1,3
45:15 46:7 47:8
53:7 55:22
56:14,21 57:1,4
57:5,11 58:4

61:5,7 76:16
84:11
distributor's 97:6
DISTRICT 1:1,1
division 6:16
62:24 63:4,5
document 3:15
43:17 73:1,7,17
75:3 76:23 77:4
80:24 81:20
87:24 95:13,18
100:20
documentation
51:20 53:19
documented 99:1
documents 64:21
98:7
Doherty 2:13
doing 10:12 13:9
62:14 76:1
91:16
dollar 47:2
Dolphin 84:9,24
93:16 94:6
dominant 28:18
Don 18:12
done 17:9 24:4
47:11 59:19
61:1 69:16
74:13 81:15
90:14
door 43:6
down 40:11 90:15
dozens 45:2
drafted 43:16
drawings 27:9
Drive 37:14
drop 34:10 60:3,3
duck 1:9 6:16,18
6:20,21 7:3,7,11
9:1,3 13:10 14:5
19:5 31:9 37:15
38:12 42:4,9
45:11 46:6
47:14 48:11
52:14 57:18
74:1 76:2 78:17
94:21
Duck's 78:23

duly 4:14 104:3
104:11
durability 85:13
durable 7:12
during 47:16
48:16 51:7
69:12 74:13
78:24
duties 8:14 9:11
9:16,23 16:9
Dyna-Med 84:6
84:10 93:14
d/b/a 1:8 6:15,20

_____E_____

each 105:10
earlier 67:12
71:18 88:3
102:11
education 17:19
17:20 18:3
58:10
educational 15:22
18:23 56:5 58:7
58:9
effort 27:1
efforts 59:16
eight 12:1 31:20
Eighty 13:11
either 29:8 66:15
69:21 102:12,13
element 76:8
emergency 10:18
10:19 11:8,9
13:20 14:14
15:23 16:2,9
employed 6:13
16:17,18 46:6
94:11 104:20,22
employee 104:21
employees 13:10
29:8
employer 51:6
employment
16:16
EMS 28:15 51:7
EMT 16:6,7 18:5
18:8 90:10
EMTs 16:3 17:22

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

encounter 36:16
51:12
end 55:16 58:6
59:24 85:20
86:20 89:6
energy 100:9
engage 50:21
59:16
engineering 13:17
13:19,22 85:12
engines 59:10
England 16:18
entailed 12:8
ENTERPRISES
1:6
entertained 50:22
enthusiasm 44:12
entire 20:23 49:5
70:11 78:16
entity 15:18
equipment 7:12
14:15 15:5
Errata 105:1,2,4
105:6,8,19,23
106:6,7
error 26:12 83:1
escape 26:5
Esquire 2:4,12
105:7,11
establish 31:3
establishing 13:1
estimate 7:5
et 10:1
ethics 29:16
Europe 62:18
evaluate 76:15
even 24:7
event 69:2
ever 6:4,6,8 17:7,9
18:17 20:20,23
29:10,18 46:16
52:7 61:4,7 65:7
67:15 81:10
83:14 94:18
95:16,17
every 12:4 28:17
everything 35:21
89:22
evidence 104:8

evolution 86:17
exact 51:4 66:22
77:17 80:22
85:2
exactly 77:13
88:23 101:24
examination 3:3
104:16
examined 4:15
104:15
example 45:20
except 4:10
106:17
exception 89:20
exchange 100:18
exclusive 9:6
excused 103:8
executed 74:5
106:20
executive 64:1
104:9
exhibit 11:16,19
11:21,23 12:2,8
65:2,6 66:19
72:16,20 76:19
80:19 81:7 82:7
82:9,14,22
83:11,14 86:24
87:22 88:12,18
90:23 92:1,17
93:12 94:18,22
95:4 97:18
98:14 99:4,7,15
exhibited 11:24
exhibiting 12:4,10
exhibits 3:7,19
64:22 102:3
103:10
Exhibit-1 65:3
Exhibit-10 92:14
Exhibit-11 93:9
Exhibit-12 94:16
Exhibit-13 95:13
Exhibit-14 96:10
Exhibit-15 98:11
Exhibit-16 99:5
Exhibit-17 99:23
Exhibit-2 72:17
Exhibit-3 76:20

Exhibit-4 81:8
Exhibit-5 83:12
Exhibit-6 86:22
Exhibit-7 87:20
Exhibit-8 88:16
Exhibit-9 90:21
exist 85:1
existence 7:1
existing 66:20,21
67:5
expanded 20:20
91:10
expedition 31:10
experience 16:5,8
38:23
expert 86:8,10
Expires 104:23
explain 39:12
extend 64:15
102:16
extent 27:6 59:1
extrication 61:20
61:22
e-mail 3:10 51:20
51:22 52:4
76:20 77:12
82:13
e-mailed 51:19
e-mailing 80:18

___F___
facetious 25:10
facility 26:8 51:22
fact 50:22 69:22
factors 54:22
factory 19:18 20:9
27:13
failed 52:17
fair 50:1 79:12
faith 59:8
fallen 39:5
Fame 51:3
familiar 97:7,12
97:14
family 63:10
far 23:8 58:9
fashion 77:24
father 63:9
favorably 50:1

favored 84:15
fax 99:2,16
feature 26:2 39:21
43:7 66:6,8
70:10
featured 93:15
federal 1:16 61:13
feedback 25:24
29:14
feel 30:9,18 43:10
44:11
feeling 44:12
felt 15:14 43:5,7
43:11 44:14
female 32:24
Fenway 50:20
51:2
Ferno 29:1 96:8
few 12:20 24:17
39:8
fiberglass 40:4,16
field 7:21 8:12,15
9:17 13:1 14:19
14:20 16:5,9,13
17:18 26:8,9,22
46:22,24 59:22
79:8
figure 65:22 66:18
67:12 70:20
71:2,21,24
filed 27:10
files 77:6
filing 4:7 22:6
fill 20:16
filled 9:22
finally 80:1,5
finance 64:3
finances 22:5
financial 21:14
56:8 64:4
financially 104:22
find 49:17
findings 77:20
fine 5:16 23:9
fine-tuning 26:22
finish 5:10 22:14
68:21
fire 28:15 55:19
56:9

firm 27:18,22
96:15
first 14:3 36:11
65:10,15 69:12
69:16 82:7,13
91:16
fishing 31:10
fit 39:17
fits 13:9
five 11:24 45:5
47:8 85:7 92:7
92:11 94:8
flashlight 15:5
Fleming 1:8 6:14
6:15,17,19,24
13:22 14:1
15:19 22:16
27:6 31:9 45:8
52:11,16 62:22
63:8,10,24 64:8
64:9,9,12 81:14
82:21 103:1
106:3
Flemings 63:14
Fleming's 25:17
26:24 63:9,12
63:21
Floor 1:21
floors 9:24
foam 37:22 38:10
68:7 80:16 87:2
92:2
folding 83:22
follow 58:14
follows 4:15
follow-up 82:18
83:2
foolish 22:24
foot 86:20 89:5
90:8
foregoing 106:17
form 4:10 20:5,19
32:24 66:16
formed 50:4
formerly 8:24
forth 54:2 101:24
Forty 19:9
forward 74:7,12
forwarded 105:11

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

founder 63:8,9
four 8:9 45:5 47:7
  55:12 89:11
fourth 1:20 96:6
free 59:22,24
from 9:14,14 13:1
  14:24 15:3,6
  16:12 17:6
  19:10,18 20:1
  20:23 21:7
  24:24 25:11,24
  25:24 27:9
  39:20 47:8 59:7
  59:10 66:4
  67:20 69:18
  76:16 79:18,21
  80:4,20,23
  81:23 82:1,18
  83:3,15 87:6
  91:21 92:20
  93:13 96:14,15
  97:21 98:7
  101:16,17
front 62:6 65:22
  66:18 93:19
full 34:24 50:24
  51:1
full-time 16:11,15
  16:16
further 4:9 102:3
  104:19,21

_____ G _____
Galls 97:12,14
gate 32:22 40:21
gather 60:13
gauge 43:10 44:11
  47:5 74:19 79:6
general 48:4 49:3
  92:10
generally 45:5
  67:8 68:24
gentleman 25:17
gets 40:4
getting 12:9
give 29:14 45:19
  57:23 59:18
given 3:19 104:18
gives 102:22

giving 22:15
global 74:20
go 14:18 17:23
  22:23 56:11
  58:2 69:15
  74:12 100:21
  102:4
goes 26:16 71:8
going 5:21 22:2
  23:15 31:9
  42:20 44:17
  49:6,21 64:20
  64:22 74:15
  76:8,11 88:12
  91:20 99:16
good 74:21
government 60:19
  60:20 61:2
Governor 104:10
graduate 18:1
grant 55:3
granular 20:11
greater 27:6 28:13
groin 62:8
guess 24:18
guide 97:8,13
guidelines 58:15
guides 97:15
gut 44:12

_____ H _____
half 8:3 37:24
Hall 51:3
HAMPDEN
  104:1
hand 67:1,8,8
  85:15
handles 36:24
hands 90:10
happen 94:11
hard 35:19
hardware 71:3
Harris 2:4 5:4
  105:11
having 4:13 13:2
  14:20
head 3:15 15:10
  15:15 31:21,23
  32:8,10,11

33:18,21,22
  34:3,5,6,23 35:1
  36:8 37:22 38:8
  38:9,10 49:14
  61:18 62:2,7,9
  66:7,11 67:4,15
  67:22 68:9,10
  68:13,16 69:1,6
  69:16,19,23
  70:6,7,11 71:10
  72:1 78:18,22
  80:3,12,20 87:2
  87:13 90:7 92:2
  94:16,24 95:1,5
headquartered
  16:20
headquarters
  29:10 37:15
Heart 18:10,14
heats 20:18
heavy 20:12
held 7:18 60:20
  101:2 102:8
help 98:5
her 27:21
hereinbefore
  104:7
hereto 104:22
Heritage 2:6
high 17:23,24
  48:14 59:3
higher 29:15
  41:23
highly 24:11
him 18:20 21:13
  22:4 36:14
  38:14,17 47:18
  47:23,24 48:13
  49:10,15,17
  50:2,5,14,16,17
  51:13,17,23,24
  52:4,7 71:6
  74:12 75:15,22
  76:10 77:23
  78:1,2,7 80:18
  82:18
himself 50:10
hits 59:5
hold 16:1 69:16

85:15
holds 67:1,8,9
hole 42:6,10
holes 40:24 41:3,7
  41:9,18,20,23
  42:17 66:23
  67:4 85:14
honestly 65:13
hook 32:21 70:23
  71:16,22 72:7
  95:1
hoops 22:24
hope 58:22
hospital 62:12
hospitality 51:2
hundred 13:11

_____ I _____
idea 70:5,17 74:21
ideas 14:24 15:2
  24:14,24 25:2
identical 42:2
  93:19
identification
  65:4 72:19
  76:21 81:9
  83:13 86:23
  87:21 88:17
  90:22 92:15
  93:10 94:17
  95:14 96:11
  98:12 99:6,24
  104:9
identified 4:14
  19:12 23:21
  65:7 72:8,21
  73:11 80:17
  84:17
identify 10:17
  12:17,20,23
  13:2,6 14:19
  21:2 96:1
II 84:9,24 93:16
  94:6
immediately 8:6
immobilization
  15:9 40:12
  66:12 67:15
  68:4,13,16,17

69:13,22 70:2,8
  70:10 72:1
  87:13,18 92:2
  96:7
immobilize 69:11
  70:7 87:15
immobilizes 69:23
immobilizing 69:3
imposed 22:18
impressed 50:2,3
impression 49:13
improved 55:1
  85:11
improvement
  25:22
INC 1:6,8 106:3,4
inch 88:4
inches 91:11
include 57:4
included 78:23
  79:2 80:11
incorporated 6:21
  63:2
independent 8:21
  8:23
INDEX 3:1
indicate 56:19
  93:2,22 105:17
indicates 73:17
  81:17 92:23
individual 16:10
  22:11,16 23:18
  50:5 55:19 56:6
Industries 1:8
  6:14,15,18,19
  6:24 62:22
  106:3,4
industry 9:8 10:15
  15:1,3,7 28:9,19
  43:9 44:14
  70:17
influence 54:23
informal 60:10,11
Informally 26:8
information 10:15
  21:14 29:18
  30:23 31:13
  35:18 58:4,11
  58:13 59:4

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc.. d/b/a Iron Duck

60:12 61:11
76:16 105:1,4
105:24 106:8
**infrequent** 24:12
**infringement**
54:12 83:4,8
**initial** 54:16
**injection** 20:13
**injured** 69:9
**injuries** 15:10
16:13
**input** 26:21
**inquiry** 77:10
103:2
**insert** 41:1
**inside** 9:14 39:17
**insist** 102:14
**Instruct** 21:13
**instructions** 105:2
105:14,23 106:8
**instructive** 58:7
**instructor** 16:2
18:11,15 19:3
**integrated** 68:17
69:19
**intellectual** 25:3
**intelligently** 79:16
**interact** 40:1
**interchangeable**
71:23
**interest** 15:14
24:6 34:7,8
53:23 54:3,14
54:17 67:14,20
73:20 74:6,16
74:18,20,23
75:1,5,12,20,21
79:6
**interested** 75:6,16
76:1,7 104:22
**interesting** 39:1
**interject** 91:15
**internally** 44:9
56:24
**internationally**
62:15
**internet** 58:18,19
**interpretation**
70:4

**interrogatories**
4:16
**introduced** 42:9
42:17 67:19
91:13
**introduction** 85:3
**introductory** 91:2
**invention** 43:4
44:3 46:16
**inventors** 23:24
**invest** 49:19
**investigate** 77:11
77:16 83:7
84:16
**investigated** 77:14
81:2
**investigation**
35:23 77:18,21
80:9 81:13 82:2
**investment** 47:13
**invitee** 51:9
**involve** 7:22 14:18
**involved** 12:13,15
13:12 16:24
17:11 24:1 27:2
27:6 61:24
64:17 66:14
**involvements** 56:4
**involves** 7:23
**involving** 34:23
**in-house** 57:5,10
**in-line** 62:10
**Iron** 1:9 6:16,18
6:20,21 7:3,7
8:24 9:3 13:10
14:5 19:5 31:9
37:15 38:12
42:4,9 45:11
46:6 47:13
48:11 52:14
57:18 74:1 76:2
78:17,23 94:21
**Island** 2:8 15:24
16:21 18:9,22
19:2
**issue** 90:15
**issued** 104:10
**item** 47:3 53:10
66:4 72:8

**J**

**J** 2:12
**January** 3:11
83:12,15
**Jaws** 62:13
**Jeffrey** 2:5
**JEM** 11:24
**JEMS** 11:13
**Jennifer** 1:17
104:2,24
**Jim** 25:18
**job** 16:15 17:15
17:17
**John** 2:12 16:23
16:24 17:3,4
105:7
**Johnston** 16:21
**Joseph** 18:17
**Journal** 10:18
11:8
**journals** 10:14,16
**June** 104:23
**just** 7:9,12 22:22
27:20 30:5
34:19 38:4
55:24 61:13
63:5,24 68:21
69:20 74:24
75:7 82:11
87:18 89:18
91:6,23 93:3
97:17

**K**

**K** 2:4 105:11
**keep** 22:9 59:1
62:2,9 91:16
**key** 26:17 59:10
**kind** 26:21 57:19
62:3,7 71:2
**Kiss** 89:10
**know** 5:18 7:1,10
13:22 17:2,4,11
18:19,20 19:8
19:17 25:14,24
27:13 28:23
29:5 30:16
34:16 35:7
36:15 45:5,17

46:18 51:15,19
51:21 57:22
64:16 67:3
77:17 80:22
81:3,4,22,24
82:21 83:20
85:2 86:11 92:9
93:17 94:7
95:16 97:3
99:18 101:14
**knowledge** 13:24
17:1,13 20:8,22
27:14 35:8 46:4
46:8,11 52:2,3,6
63:7 64:19
70:12 82:20
100:19 104:13
**knowledgeable**
22:12

**L**

**labeled** 19:16
94:10
**laboratory** 26:7
**language** 39:12
**lapse** 79:20
**large** 15:4 60:7,19
90:4,5
**last** 11:13,23 12:2
25:15,20 30:17
41:17 42:21
80:5 85:7 90:7
92:7,11 94:8
**later** 51:23 55:12
89:19
**latitude** 102:23
**launches** 42:15
**law** 2:5 27:18,22
**Lawrence** 1:14
3:4 4:13 5:3,4
65:5 86:7
102:10,13,22
103:5 104:8
106:2,21
**lawsuit** 6:6,9
64:10
**lawyer** 83:19
**lawyers** 53:15
64:11

**leader** 29:3,24
30:3
**leaflet** 57:19
**least** 95:24
**leave** 17:14 45:24
**leech** 25:8
**left** 66:13 68:11
**Legal** 1:20
**legs** 43:12
**length** 47:24
**lengths** 33:12
**lengthy** 42:23
**Less** 24:19
**let** 5:18 68:21
95:16
**letter** 3:11,11,16
3:16,17 81:8,11
81:14 82:3,5,8
82:12,18,24
83:12,15,18
96:10,12,14,22
97:21 98:7,11
98:13,20 99:2,5
100:5,6,7
**letters** 83:3
**Let's** 15:21 36:10
81:6 98:6
**level** 15:24
**Liberty** 1:20
**license** 16:1 98:18
98:19,22
**licensed** 16:1,7
49:18 50:10
66:10
**licensing** 98:1,2
101:4,8,12,21
**Life** 62:13
**like** 20:10 22:6
25:12 29:24
30:6 39:15 40:3
40:8 48:6 62:3
65:21 72:15
85:9,23 89:17
91:16 95:8
**likely** 30:2 49:4
51:7 94:4
**Likewise** 73:9
**limitations** 102:18
**limited** 21:24

56:24
line 13:8 14:16
  20:20 24:23
  33:17 41:11
  58:11 62:2 71:8
  71:11,14,15
  78:16,21 82:7
  96:8 102:1
lines 10:10 20:23
  28:6 36:4 41:4
  96:6
line-up 49:16
listed 58:20
listings 91:6
literature 19:13
litigation 23:17
  64:18
little 15:21 71:14
Loc 68:4,7,8
local 58:14 66:13
  66:13 68:11
  93:4
located 28:16
  37:13 41:18
  86:4
location 11:17
locations 40:11
lock 40:19
locks 40:21
Loc-quick 78:22
  80:3,16,20 87:2
Loc-Velcro 78:18
Logistics 12:9
logo 99:16
long 6:24 7:3,14
  7:24 8:8 30:12
  42:3,20
look 20:10 25:12
  40:8 54:19
  65:21 71:7
  72:12 84:19
  85:9 89:7 90:24
  95:15 96:17
looking 22:24
  48:7 54:14 77:3
  89:3,12 97:10
looks 40:3 62:3
lot 54:1 57:13
  59:18

low 47:2
lower 41:24
lying 69:9,14
lyme 26:5

——————— M ———————
machine 20:17
machinery 20:12
made 21:17 33:24
  34:3 39:8,19
  40:15,16 52:13
  53:4 81:17 85:9
  89:6 106:19
Magazine 11:9
magazines 11:8
Main 1:20 2:7
maintain 75:14
maintaining
  17:21
major 31:15
make 28:2 29:6
  33:17,21 47:17
  54:4 57:12,21
  90:18 105:20
makes 40:19
  80:24
making 22:23
  81:1 82:18 83:3
  94:6
male 32:24
man 21:15
manage 9:14,17
  23:16 37:4
managed 11:7
management
  39:16 64:6
  79:21
manager 64:7
managing 9:24
  58:23
manner 62:8
  69:21
manor 55:9
manually 69:16
manufacture 14:5
  19:24 20:1
manufactured
  14:7 19:6,14
  27:11 84:6

93:17
manufacturer
  27:10
manufacturers
  19:10,12,15
  66:24
manufacturing
  19:11
many 8:19 9:5
  10:2 13:10,12
  19:6,8 24:4,15
  30:16 31:18,23
  44:23 57:21
  63:23 66:24
  67:1 78:21 83:7
March 1:22 32:3
  33:16,20,24
  37:10 41:4,11
  42:10 50:17
  63:19 68:1 73:5
  80:4 84:23 85:2
  85:4 88:8,22
  104:6 106:5
mark 64:22 65:1
  72:15 76:18
  81:6 86:21
  87:19 88:12,15
  89:18 90:17
  91:22 92:13
  93:8 95:12 98:6
  99:3,14
marked 65:3,6
  72:18 76:20
  81:8 83:11,13
  86:22 87:20
  88:16 90:21
  92:14,17 93:9
  94:17 95:13
  96:2,11 98:12
  99:6,23 103:10
market 10:1,4
  25:23 28:8,11
  28:14,21 29:2,3
  29:22 30:3
  43:10 44:11
  46:24 47:5,21
  47:21 48:15,21
  49:2,5,22,22
  52:7 55:8 67:20

70:9 85:17
marketed 63:1
marketer 70:16
marketing 11:18
  47:3,9 56:10,13
  58:2 59:16 73:6
  76:1 79:9 99:11
marketplace
  34:10 38:18
  54:16,21,24
  55:12 66:10
  74:19 76:7
  89:2
markets 28:7
marks 105:20
married 45:23,24
marries 33:6
  71:15
marry 43:8
Martin 32:2
Maryland 11:15
mass 15:4 21:3
  55:8
Massachusetts 1:1
  1:19,21 2:15
  37:14 104:1,5
  104:11
match 13:8 20:18
  32:24
material 38:6,7
materials 19:20
  23:9
Matrx 96:24
matter 61:15
  73:21
matters 104:14
may 3:16 38:6
  49:7 51:8 98:6
  98:11,20 99:18
maybe 54:14 98:5
McCARTHY
  2:12 18:5 21:12
  22:19 23:14
  27:20,24 28:4
  30:20 31:1
  34:19 50:7
  55:24 56:3
  64:24 71:6,11
  75:2,7,17,22

76:22 82:4,9
  86:3,6,11 91:15
  95:21,24 96:19
  97:17 98:8
  99:21 100:21
  102:4,9 103:4
  105:7
McCarthy's 27:18
  28:1 101:18
McGonagle 53:18
  83:6
MCI 15:4
mean 20:15 30:21
  34:7 42:13
  47:10 49:20
  50:9 52:19 55:7
  56:1 61:22
  64:14 67:8
  73:13 74:21
  77:9 79:11 83:2
  84:2
meaning 16:3
means 74:24
medic 50:11 63:1
medical 10:18,19
  11:8,9 12:1
  13:20 14:14
  15:23 16:2,10
  21:8,8 50:21
  51:5
meet 12:18,23
  37:11 39:9
meeting 24:20
  27:4 32:2,5 36:3
  36:10,20,22
  37:3,19,21 39:3
  39:4 42:20,23
  43:14 44:4
  45:13 46:16
  47:16 48:17
  50:14,16 74:6,8
  74:11,13,14
  76:14 79:1
meetings 24:16
member 18:23
members 63:10
memory 37:6 47:7
mentioned 12:20
  61:16 98:19

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries. Inc.. d/b/a Iron Duck

Mercy 12:1
merit 43:5,7
met 17:7,8
Michael 14:4
Michaelson 83:16
mini 103:6
mismanaged
58:24
missions 41:20
Mm-hmm 58:3
71:20
mobilization
14:11 21:3
32:11 34:6 35:1
36:8 39:13
49:14 66:7 94:5
mobilize 32:17
33:14 69:1
models 91:6
modifications
57:13 86:14
modified 85:4
mold 20:19
molded 20:14
molder 20:17
molding 20:13
Monarch 2:14
money 48:8 54:22
55:3
monitor 10:4,11
12:17 59:5
month 24:10,14
months 25:15,20
41:17
more 15:21 22:7
22:11 29:7 55:3
55:4,6 57:19
65:14 67:8 85:9
89:7 100:17
Morris 25:18
26:14
most 11:12 30:8
30:10 55:16
77:7
motion 22:7
motions 4:11
motor 61:24
moved 85:14
movement 68:23

moving 74:6
76:22
much 10:8 16:5,8
47:13 59:8
84:15
multiple 34:21
multi-use 68:6
municipal 61:8
municipalities
60:7
Murphy 2:13
must 28:22 50:4
mutual 44:8
myself 13:16
25:17 30:13
37:1,18 44:8
63:24 64:8
77:19 99:13

— N —
name 5:2,4 7:3,9
7:13 14:3 17:2,2
17:4 25:16,18
27:13 51:4
80:19 84:3
named 104:7
names 44:22
narrative 94:1
95:19 96:5
nation 84:15
nature 28:21
68:15 69:5 85:8
necessarily 19:17
necessary 102:24
105:22
neck 15:10 68:14
need 13:1 25:21
38:18 44:10
59:22 102:15
needed 43:18
74:18 86:19
needs 44:13
negotiated 94:15
neither 96:3
104:19
neutral 62:2,9
never 17:8 19:3
41:8 52:1 96:2
new 12:2,13,16,17

12:20 14:7 16:3
16:3,18 24:1
42:10,17
news 17:6
next 47:18,19
72:16 76:19
81:6 83:11
90:17 92:13
95:12 99:3,14
niche 28:21 29:2,3
nine 7:15 31:20
Ninety 19:7
Non 73:15,16
nondisclosure
43:13,18 44:7
48:19
none 33:23 66:5
92:6
normal 47:1
Norwich 17:16
Notary 1:18 4:14
104:3
notations 105:20
noted 106:18
nothing 87:13
102:2 104:12
notice 21:20 23:1
notify 73:19
not-post 55:7
number 24:5,8
44:24 45:3
54:22 57:22
59:5 70:21,24
71:2 72:11 77:3
83:21,24 84:4
100:3
numbered 72:10
numbers 57:1
59:9

— O —
oath 6:4 104:15
object 21:16 23:12
30:20
objected 21:14
103:3
objection 21:12
22:19 23:6
30:21,24 31:1

41:21 50:7 75:2
75:17 86:3,6
96:19
objections 4:10,10
21:17
Observations
17:6
obtain 31:12
73:20 75:4,11
obviously 18:21
43:5 83:5
101:17
occasionally 60:1
occurrence 24:12
October 78:11
82:16
off 11:17 12:7
16:11 44:13
60:11 76:24
99:19 100:21,24
102:4,6
offer 92:21 101:13
101:16,19
offered 29:18,20
31:8 84:21,22
office 2:5 8:16
9:14,15 44:10
51:16,18 64:14
officer 64:4
offices 83:6
offs 89:10
off-the-record
101:1 102:7
often 24:7 57:11
58:22 90:11
Okay 5:20 64:24
82:9
old 6:11 85:10
once 24:9,10
26:22 80:7 83:9
one 2:14 11:10
13:11 23:8
24:14 25:5
31:15,16 33:13
35:3 37:18 38:4
39:8 41:13
42:18 46:6
57:15 72:2
80:14 84:11

87:9 90:18,19
91:4,11 92:13
93:8 99:15,17
102:9
ones 90:3,4
only 9:3 23:8 34:8
36:3,21 37:18
38:7 39:1 79:11
80:12
onto 40:21 62:11
69:10
on-line 35:16
open 22:10 64:8
opening 89:17
openings 89:7,12
89:13,15,19,21
operate 6:15
opinion 50:4
66:19
opportunity 22:15
oral 73:13,14
orange 94:4
order 40:24 47:11
62:2 64:23
104:9
original 85:9
91:10,12 105:6
105:11,12
Orleans 12:3
other 9:4,5 18:5
19:10,12,15
23:9 26:6 27:4
28:7,10 32:15
33:11 38:12,14
39:4 41:19,24
42:5 44:13
45:10,15 48:16
49:10,15 50:6
51:12 52:4,11
52:12,17,18
53:11,13 59:16
61:13,19 62:17
62:22 63:6,10
63:16,18 64:11
64:17 73:10
77:23 80:10
84:14 85:1 89:7
91:17,21 92:4,4
92:5 102:14

103:1,2
others 12:21
  40:16
otherwise 70:15
out 14:22 23:12
  39:15 49:16
  62:10 92:7
outline 99:10
outside 8:16 24:24
  28:11 39:16
  44:10 45:14,18
  89:22
outsource 19:11
over 25:20 26:3
  26:17 57:14
  58:23 80:19
  85:7
overnight 55:9
overseas 27:9
  62:20
overseeing 9:24
own 14:23 19:24
  25:5 56:20
  57:15
owned 30:11
owner 14:1
ownership 74:24
  75:4,11
oxygen 21:5 61:21

**P**
Pacific 29:1
package 100:11
pad 94:24
page 3:8 65:22
  91:2,3,5,17,17
  91:21 92:20
  93:13,13,15
  96:6 106:7
PAGELINE
  106:9
pages 90:19 91:1
  91:22 96:5
pans 14:22
paradigm 54:23
parallel 66:15
paramedics 16:4
parasite 25:7
parent 6:19

park 50:20 51:1
part 55:17 79:9
  100:7
participate 61:4
participated
  18:24 26:20
particular 7:8
  10:6,8 40:14
  47:24 56:9 67:3
  67:7 90:14
  97:16
parties 4:3 25:1
  44:23 53:11
  73:10,10 100:13
  104:20,22
partner 28:5
partners 27:21
parts 65:18
party 6:6 105:10
pass 61:10
past 60:21 90:6
patent 3:9 25:5,14
  27:3,4,10,15
  46:13,15 54:12
  65:3,7,16,17,18
  65:20,22 66:4
  70:2 78:5 83:4,8
  83:20 84:18
  86:2,7,12
patented 84:14
pathogens 26:6
patient 33:15
  68:23 69:3,3,4,9
  69:13
patient's 32:17
  40:5 66:9 69:1
  87:16 93:7
pattern 66:11
paying 21:9
pediatric 14:11
  15:5 21:3,6
people 24:13,16
  26:1 39:8 44:10
  44:14 50:24
  51:1 52:18,20
  53:2 58:23 60:9
  79:14
per 55:20
percent 19:7

24:19
percentage 24:18
Perfectly 5:16
performing 16:9
period 79:1,2,18
  79:22 98:17
permits 57:12
perplexed 84:20
person 104:7
personal 74:18
  90:15
personally 10:22
  35:14 50:2
personnel 10:2
  12:12 13:1
  14:20 38:24
  45:10 103:1
pet 28:9 63:1
phone 24:13,15
  51:24 52:5 78:7
phoning 51:17
photocopy 99:18
photograph 57:6
  89:3
photography 57:3
physically 26:13
  49:11
pick 49:15
pictured 93:21
  94:21
pictures 65:19
piece 33:12,13,14
pile 98:9,10
Pillsbury 2:13
pin 40:3,4,4,8,9
  40:14,15,22,22
  41:1 71:4 72:10
  85:19,21,21,22
  86:1 93:3
Pine 2:5
pins 32:12 40:1
  85:18,19 89:5
  89:14,16,19,23
  90:6,11 92:22
  92:24 93:5,23
  94:2,4
place 2:14 36:22
  50:23 89:14,16
  89:23

placed 40:9 41:21
  52:1 71:4 85:20
placement 85:16
  93:3
places 86:5
plainer 39:12
Plaintiff 1:6,15
  2:10
planning 22:4
plastic 20:5,6,18
  40:23 83:22
  88:20
please 72:16 76:19
  81:7 86:21
  87:19 90:18,20
  90:24 92:13,18
  93:8,11 95:12
  99:4 105:17,22
  106:1,7
point 47:19 49:21
  49:24 53:14,23
  54:5,20 97:23
  102:1
pointing 66:1,2
  89:9
poker 46:2
Police 28:15
Polsinea 18:18,19
  18:21,22
polyethylene 20:2
  20:5,7
pop-up 59:12
position 9:21 22:3
  62:10 64:8
positions 90:9
possession 75:14
possible 42:16
  46:9,10
Postal 99:2
post-secondary
  18:3
post-911 55:1
potential 12:17,19
  15:14 55:10
  98:17
potentially 31:11
  46:23 49:19
  54:20 70:19
powder 20:11,13

Powis 1:17 104:2
  104:24
practical 59:1
practice 61:15
  68:24 70:14
predated 42:4
preexisting 94:14
preference 90:16
  93:4
preparedness
  55:4
prescribed 104:9
presence 79:5
present 9:23
  101:11
president 7:17 8:2
  9:19 13:16
  21:22 63:22
  64:1
presidents 63:23
presumably 72:2
pretty 78:3
previous 7:20 8:5
  8:10
previously 21:4
  21:24 40:7
  47:20 55:13
  67:21
pre-911 54:21
prices 60:22
pricing 61:12
pries 25:11
primarily 10:5
  15:13 86:18
principal 16:22
  31:8
print 34:15 56:22
  87:6
printed 34:14
  57:17
prior 12:4 32:5
  36:16 37:2
  84:23 85:1 88:8
private 19:16
  94:10
privately 30:11
privilege 96:21
probably 55:14
problem 13:2,4

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

14:19,21 23:15
**problems** 13:7
**Procedure** 1:17
**proceed** 74:15
**proceeding** 22:13
103:11
**process** 20:16
26:21 57:14
70:8 76:1 80:9
**produce** 34:14
47:4 95:2
102:13
**produced** 21:15
21:19 23:8 47:7
56:24 57:19
**product** 10:8,9
12:9,13,16,18
13:3,5 14:11
15:4,5,13,13
20:20 21:3,4,6
24:1,23 25:19
26:7,19 27:8
28:6 29:5 30:8
33:17 35:11
36:3 39:2,9,17
39:19 41:4,11
41:12,22 42:7
42:14 43:12
44:9 45:6 46:21
47:6,12,22
48:14 52:13
53:12 54:17
55:6,11,13 56:5
56:22 57:6,17
58:11,13 59:18
60:1,2,2,3,23
62:3 67:7 68:6,6
68:7 69:23 70:3
70:9,17 72:2
74:17,20 75:5,6
75:12 76:15
78:15,16,19,20
79:13,15 80:12
80:14 81:22
82:1 84:3,5
85:10,13 86:10
86:15,17 87:3
87:10,12 88:8
88:24 89:1 91:6

91:8,12.12
92:19 93:15,18
93:18 94:10
95:20,21,23
**production** 22:8
53:2,4 64:7 98:7
**products** 9:3,4,5
10:6 12:11,23
13:8 14:7,10,23
15:12 19:5,8,21
23:21 24:1,5
28:10 29:1,15
31:15,17,18,23
38:12,15 39:11
41:8,19,24 42:9
42:19 43:8 49:3
49:8,11 51:7
53:24 55:8
58:20 59:3
61:17,19,20,23
65:21,24 66:5
66:12 67:7,22
68:3 70:5 78:23
79:3 80:10
83:19,20 84:17
87:8,14,17 89:8
94:21 95:3 97:4
97:6
**professionally**
57:17
**profile** 57:2
**programs** 59:20
**promise** 48:21
**prompted** 54:9
**properly** 5:7
**property** 25:4
75:14,16 76:8
76:12
**proposal** 54:4
101:21
**proposals** 101:11
**proposed** 3:17
100:9,11
**proprietary** 35:17
**protocol** 66:13
93:4
**protocols** 19:1
58:15
**prototype** 26:9,11

38:1
**prototypes** 36:4
46:18
**provide** 10:14
58:4,6,12 61:11
73:21 76:11
**provided** 34:9
51:21 104:8
**Providence** 2:8
**provides** 57:9
**providing** 26:21
76:4 100:9
**provisions** 1:16
**public** 1:18 4:14
9:10 12:11 28:7
28:11,14 55:1
61:5 104:3
**purchase** 19:20
**purchased** 92:24
**purchaser** 19:17
**purpose** 21:16
24:21
**purposes** 58:7,9
**pursuant** 1:16
**put** 24:5 26:13
43:1 47:4 59:8
79:10 86:18
90:6,11 99:17
100:9
**putting** 40:2
**P.C** 2:13
**p.m** 103:9

_____ Q _____

**qualified** 104:4
**quantify** 30:1,4
30:10
**quantities** 92:22
93:1
**queried** 35:10
**question** 4:11 5:10
5:17,21,22,24
32:13 33:19
75:8,10 96:20
**questioned** 6:8
**questions** 5:5,6
22:4 29:16
60:14 102:23
**quick** 87:11,12,14

**quoting** 82:11

_____ R _____

**raised** 30:21 80:8
**rapid** 55:9
**rather** 22:14,23
**reach** 100:13
**reached** 48:16
**reaction** 44:11
**read** 4:5 10:22
27:22 65:17,18
73:22 74:24
102:10 106:17
**reading** 105:16
**Reads** 87:2
**ready** 55:12,13
**really** 9:20 39:1
71:17 72:12
88:13 90:15
93:3,4
**reason** 105:18
106:9
**reasons** 29:17
102:14
**recall** 32:2 35:4,5
35:6 37:20,22
37:23 38:5,7,8,8
38:13,14,16,17
38:21 39:4
42:22 43:3,13
45:12,16,18
46:14,17 48:1
49:1,4,9,10
50:13,15 51:17
52:12,15,23
53:13 54:1,2
63:20 65:11,13
65:15 68:3 77:4
77:5,6,13,22
78:1,10 81:19
83:2 94:9 95:17
100:15 101:23
102:22
**receive** 18:7 24:13
**recent** 11:12 77:8
**recently** 77:5
**receptacle** 32:15
**recertifying** 17:22
**recess** 77:1

**recessed** 22:13
**recollection** 17:1
36:18 42:12
45:7 48:9,18
52:9 53:8 82:15
83:9 97:10
98:16
**reconciled** 44:6
**record** 5:7 21:18
76:24 96:1
97:18 99:17
100:22,24 101:3
102:5,6 104:17
105:10 106:18
**records** 35:10,13
35:19
**rectangular** 89:11
89:15
**recycled** 85:10
**redesign** 85:6,8
88:23
**reduced** 104:16
**refer** 71:18
105:22 106:7
**reference** 7:7 82:6
90:7
**referenced** 61:14
81:14
**references** 82:23
83:18 96:8
**referencing** 67:12
**referred** 70:22
88:3
**referring** 15:17
64:21 71:21
90:3 94:5
101:18
**reflect** 34:12
**refresh** 98:16
**regarding** 33:17
43:4 53:7 98:1
103:2
**registered** 25:14
**regular** 24:11
**regulator** 61:21
**reinforced** 40:23
**rejected** 101:15
**relate** 31:6
**related** 63:6,14

86:15 100:17
104:20
**relationship** 6:17
49:19
**relative** 104:21
**relatively** 43:1
47:2
**relatives** 63:16,18
**release** 71:1
**relevancy** 31:3
**remember** 36:11
36:20,21 39:3
43:21,23 54:8
91:13 97:15
**remove** 69:5,17
79:18
**removed** 79:21
80:1,5,7,20,23
81:5,22 82:1
**removing** 25:7
**renew** 53:23
54:14
**rep** 14:19 59:22
79:8
**rephrase** 5:19
32:13 33:19
61:6
**replied** 51:23
**reply** 77:9
**reporter** 1:18 3:19
5:7 104:3
**represent** 9:3,4,5
**representations**
47:17
**representative**
7:21 8:11,12,15
9:12,13 74:1
**representatives**
98:1
**represented** 50:10
**represents** 96:16
**reps** 9:14,17,17
**request** 23:4,5
78:2 85:20,22
89:17 90:13
**requested** 78:1
**requirement** 61:3
**research** 13:6,12
14:8,17

**reserve** 22:9
102:21
**reserved** 4:12
**reserving** 102:12
**resolution** 100:8
101:15
**Resources** 1:20
**respect** 34:22
102:3
**respective** 4:3
**respond** 78:5
**responding** 5:23
82:21
**response** 25:21
43:10 47:5,22
50:21 51:6 78:6
78:9 82:3
**responses** 22:1
**responsibility**
81:16
**responsive** 22:7
**Restate** 75:9
**restraint** 3:15
31:21,24 32:8
33:18,22 34:3
34:24 94:16,24
**result** 24:15 34:11
**results** 52:8,10
53:7
**return** 46:20
**returning** 78:2
**review** 73:18 77:8
**reviewing** 77:5
**Rhode** 2:8 15:24
16:21 18:9,22
19:1
**right** 5:15 22:9
23:1 56:2 91:19
99:22 102:21
**rights** 25:4 102:12
**Robert** 97:21
**roll** 69:4
**rolled** 40:16 68:10
**room** 37:12 38:11
49:11 50:24
51:1,2,4
**rotate** 11:9 62:10
69:17
**rotates** 11:11

**rotationally** 20:14
**rough** 26:22
**routine** 52:19
**royalties** 22:5
48:4
**royalty** 21:1,9
23:22 48:2 54:4
75:13 99:11
**Rules** 1:16

_____
S
_____

**safety** 9:10 12:11
28:7,11,14 29:1
55:2
**sake** 34:20
**sale** 56:11,22
84:21,23
**sales** 7:17,22,23
8:2,7,8 9:16,19
9:21,24 10:1,2,5
10:6 21:23 22:5
26:1 29:4,5
30:21,23 35:10
35:11,19 45:13
52:18 56:1
52:18 60:9
**Salter** 83:15 96:15
97:22 .
**same** 5:14 23:4,6
27:1 29:12 42:6
69:24 82:19
83:4 86:1,4,5
87:8,10
**samples** 34:9 36:4
47:4 52:13
59:23,24 73:10
80:11
**satisfactorily** 4:13
**satisfactory** 104:8
**save** 38:24 83:22
85:6
**saw** 65:15 77:7
**saying** 16:12
22:23,24 36:2
66:5
**says** 76:3 78:4
82:12 87:24
94:3
**scene** 66:14

**schedule** 36:24
37:3,4 48:2
**school** 17:23,24
**scope** 24:23
**scuttlebutt** 64:15
**se** 55:20
**sealing** 4:7
**search** 59:10
**seat** 33:13
**seated** 62:1
**second** 18:3
72:13 86:17
91:3 92:20
100:22 102:5
**secret** 30:18
**sector** 55:2
**secured** 40:22
**see** 13:7 43:11
44:11,14 47:5
47:21 49:22
55:10 65:10
73:6,9 80:24
**seeing** 77:4,5
95:17
**seen** 29:10 53:20
65:7,19,20
72:22 81:10
83:14,17 94:18
95:2,16 96:2,12
96:24 97:3,5
98:13 99:7
100:1
**segment** 72:1
**sell** 9:9 19:8 28:7
28:9,10 31:18
31:21 33:7,11
54:18 58:19
62:15,17 65:21
67:22 68:1,16
69:22 87:8,10
87:12,14 94:21
95:3,7,10
**selling** 29:15 30:8
30:12 32:5,8,10
32:12,14 39:20
48:14 55:16
56:17 62:13
**sells** 19:5
**senator** 18:21

**send** 23:1 59:22
59:24 103:4,5,6
**sending** 73:9
**sense** 28:22 29:7
29:21 30:7,9
**sent** 51:22 82:24
**separate** 91:20,21
**separately** 6:21
63:2 69:2 91:22
**September/Oct...**
12:2
**series** 5:5 22:4
**serious** 78:3
**Service** 16:19
17:16 99:2
**services** 10:18,19
11:8 12:1 13:20
14:14 16:2,10
58:6 60:8 73:21
76:4,11
**setting** 12:9 36:20
**settlement** 54:10
101:19
**shape** 20:19 67:23
**shaped** 40:14
**share** 29:23 52:10
**shared** 36:5
**sheet** 56:22 60:12
91:3,24 105:1,4
105:6,8,19,23
106:6,7
**sheets** 56:22
105:21
**Sheila** 63:24
**shifted** 55:8
**shipments** 60:3
**ships** 34:10
**shortly** 80:4
**shot** 55:15
**show** 11:10,12,16
11:24 12:5,10
12:11 43:9
44:10,21,23
45:1,6,8,10
47:11,20 50:20
51:6 52:7 74:19
**showed** 38:14
**showing** 44:3
45:18 49:10

Brooke Lawrence 3-30-2006
Tyrnel Enterprises. Inc. v. Fleming Industries. Inc.. d/b/a Iron Duck

65:5 72:20
90:23 92:16
shows 11:3,5 58:2
60:6 70:20 72:1
side 40:10,11,22
68:18,22 71:1
89:13
sides 33:6 40:5
sign 4:5 44:1,2
102:10 105:19
signature 72:24
105:2
signed 4:7 43:13
74:8 75:23
105:9
significant 62:19
signing 75:24
76:12
similar 62:7
simple 43:1
simply 22:13
25:11 50:22
since 16:7 33:24
36:15 37:4 41:4
41:11 42:10
50:17 54:15
88:22 96:1
single 33:12 68:5
69:22 70:2
sir 5:2 6:11 19:4
21:10 24:3 37:8
51:11 55:21
63:7,15 64:5,19
65:20 70:12
72:20 73:23
81:5 87:4,13
88:9 90:5 98:15
sit 31:10
sites 59:14
situations 56:6
six 45:5 54:15
92:7
sixty 19:9
size 60:2
skin 25:11
slide 25:13 26:3
26:16 69:10
slipped 62:4
slots 67:7

slotted 40:4
small 45:3,4 90:3
90:5
smaller 89:15
snap 32:21 70:23
71:16,22 72:7
95:1
Soft 68:4,8
sold 30:17 32:16
35:7 42:3 67:15
88:8
solicit 14:24 24:24
25:2
solicited 15:2,6,9
soliciting 76:15
solution 14:21
solve 14:21
solves 13:3
some 12:15 14:10
14:24 15:2,12
19:10,11 26:9
28:22 29:12
31:3 36:4 38:24
41:10 43:5,6
47:4 50:4 53:14
53:23 54:5 58:6
64:21,22 75:21
79:6,14 85:11
85:15 89:2
90:12 95:7 96:7
97:23 100:8,9
101:9
someone 22:17
31:11 77:15
78:4
something 24:10
39:14 54:18
57:9 95:7
sometimes 14:22
14:22 57:11
sorry 14:13 18:13
32:13 33:19
53:17 61:6
73:16 75:9
78:11 82:8 89:5
97:20
sort 95:7
South 2:7 62:18
space 57:12 83:22

85:6
Spac-Sav 83:21
88:20
speak 5:14 84:24
98:3 99:1
speaking 50:13,15
77:22
speaks 75:3
specific 7:4 20:8
24:7 30:15
41:16 42:14,19
43:23 44:22,24
45:7 51:21 53:8
53:9 54:2 57:22
59:22 65:11
78:10 80:2 81:4
81:24 92:9 93:3
94:7 96:17
97:10 100:19,20
specifically 39:23
45:12 46:17
49:9 51:17 67:6
84:24 97:15
specifics 49:4
speed 32:19,20
38:22 40:6,12
43:8 67:11,13
67:16 70:6,6
71:18,22 72:5
86:15 87:16,18
93:5
speeding 70:8
speed-clip 94:2,3
Spine 84:9 93:16
spoke 21:4 53:11
spoken 50:17
sponsored 50:20
59:14
spoon 25:13 26:4
26:16,17
spring 32:22
Springfield 1:2,21
2:15
SS 104:1
stab 57:15
stabilization
33:22 34:23,24
38:19 61:18
stabs 56:23

stack 28:22 29:21
stand 21:21
standard 85:19,21
Standards 18:23
standpoint 59:7
start 49:20 52:14
94:6
started 56:16
state 15:24 18:22
19:1 61:8
stated 31:1 47:20
65:22 67:21
81:20
statement 74:23
statements 106:19
states 1:1 100:11
status 46:15 84:15
steel 40:16
step 47:18,19
still 22:17 79:23
stipulated 4:2,9
STIPULATIONS
4:1
stock 59:20
stokes 86:19
stop 99:19
store 15:4
strap 33:6 34:7
38:8 49:15 50:3
62:5 67:13
80:12 87:18
94:24
strapping 40:5,6
straps 32:12,14,15
32:16,23 33:9
33:11,12 34:23
36:9 37:22
39:22 43:8
61:20 62:6,8
66:9 70:7 87:15
95:9,10
street 1:20 2:7
28:17
strength 85:12
strike 4:11 84:22
stuff 62:14
style 33:13
subject 21:16
23:22 46:15

73:21 96:20
102:11
subjects 22:12
submit 76:3
subscribe 10:20
106:18
subsequent 101:7
substance 43:3
substantially
82:19 83:3
substitute 68:10
Suite 2:7,14
supplied 105:19
supplier 28:18
suppliers 19:22
supply 60:22
support 31:5 51:5
58:6
supported 79:4
supports 56:13
sure 47:10 48:5,12
51:4 53:19
66:17 81:3
88:23 100:23
101:24
survey 60:8,10
surveys 60:5
suspended 102:17
102:19 103:9
swivel 32:21
70:23 71:16,22
72:7 95:1
sworn 4:14
104:12
system 3:15 15:16
21:5 34:6,23
35:1 36:8 38:19
39:13,14 66:7
67:16 68:4
80:13 87:13
94:5,17,24
systems 15:9
31:21,24 32:8
32:11 33:14,18
33:22 34:4
61:19 68:9,13
68:16,18 92:3
96:7

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

**T**

table 101:14,22
take 18:17 24:20
  44:9 55:14 71:7
  76:23 84:12
  90:24 95:15
taken 1:15 56:23
  77:1 104:21
  106:5
taking 102:16
talk 15:21 36:10
  37:2 45:12,14
  48:2,4 49:2
  50:11,12 53:14
  59:21 79:5
talked 23:24 49:5
  49:7
talking 12:11
  45:21
taper 85:16 86:17
  86:20 89:5
tear 56:22 91:3,24
technician 15:23
  16:10 17:18
  66:14
technician's 68:11
Technologies 21:8
telemarketers
  60:16
telephone 60:6,8
telephoned 51:15
tell 43:18 46:12
  47:23 48:7,13
  61:22 75:15
  76:6,10 82:4
  86:24 87:22
  88:18 90:24
  92:17 93:11
ten 73:19 74:3
  75:15 76:12
tenure 78:16
term 43:12
terms 21:11 29:4
  29:22 48:8 56:1
  56:4 58:1 71:23
  92:10
test 46:24 47:21
  48:21 49:22
  52:7,17,20 53:4

53:7 73:6 79:9
  79:12,18,22
tested 26:5,9,9
testified 4:15 6:4
testify 21:23
  71:12 86:13
  104:12
testimony 44:16
  44:19 104:18
  105:18
test-market 78:24
  79:2
test-marketed
  34:5 67:19
text 57:9 95:15
Thank 23:19
their 13:6 23:24
  29:5,10 44:11
  51:3 57:4 68:18
  68:22 69:1,10
  69:11,14,15,15
  69:18 78:5 85:2
  97:14
therefor 105:18
thereof 105:9
they'd 56:16
thickness 93:20
thing 34:8 36:21
  39:1 51:5 75:24
  79:12
things 47:2 48:6
think 24:20 29:24
  30:2,6 36:2
  39:19 49:7 51:9
  53:11 54:19
  70:13,16 71:8
  74:21,24 75:19
  75:20 77:7
  80:16 92:11
thinking 30:7
third 51:8 91:5
Thirty-three 6:12
though 45:21
  53:14 69:19
  98:9
thought 49:14
three 23:21 62:6
  83:18 84:16

96:5
three-ring 57:2
three-sixteenths
  40:9,18
through 10:5
  22:23 40:10,22
  56:12 61:1 63:1
  80:8 82:22 83:5
  96:22 101:10
  103:10
throughout 11:10
  11:11 26:20
Thursday 1:21
tick 25:9,11 26:4
  28:9 62:24
tied 62:7
Tim 18:16
time 4:6,12 5:14
  23:13 34:8 35:4
  38:13,24 43:2
  47:24 48:3
  50:23 52:24
  69:24 72:13
  74:5,8,17 75:5
  75:12 77:17
  81:2,23 89:2
  90:12 98:17,23
  101:23 102:1,16
timeline 88:24
times 24:4 54:14
  83:7
tip 68:18 69:20,21
tipped 68:22
title 7:16,18,20
  8:5,6,10 9:20
  63:21
today 22:3,14
  102:20
today's 103:11
together 26:13
told 44:16 53:3
  75:22
tool 20:17 25:7
  28:9 62:24
  85:10
top 26:3,17 41:24
  78:6 91:2,21
  99:16
torso 70:11

total 10:9
touching 104:13
towards 14:21
  55:8
towel 68:10
tracking 10:5
trade 7:9 10:14,16
  10:24 11:3,5
  12:10,10 30:18
  50:20 58:2 60:6
train 16:3
trained 79:14
training 18:5,8
transaction 56:8
transcript 3:19
  4:5,8 105:12,20
  106:17,18
transport 62:12
treat 23:2
treating 22:20
trends 10:1,4
  12:18,19,21,24
trial 4:12 26:12
tried 50:21
truck 16:11
true 104:17
truth 104:12,13
try 5:18 13:2 59:1
  59:3
trying 60:12 79:6
turn 22:21
turns 20:17
tweak 57:12
two 5:14 8:3 10:3
  13:14 20:17
  32:1 33:6,13
  34:23 45:1
  47:15 62:8
  65:14 70:20
  80:6 85:1 96:5
  102:10
type 60:2 62:14
  67:2
types 33:11 70:20
  70:21
typewriting
  104:16
typically 9:8,13
  11:7,10 12:6

45:24 48:6
typographical
  83:1
Tyrnel 1:6 3:15
  94:16 106:3
Tyrrell 32:3 36:12
  36:16 37:2,19
  43:4 44:9,17
  46:12 47:17
  49:13 54:5 74:3
  76:6 77:21,22
  79:1 81:17 83:3
  83:5 95:23
  97:24 98:22,24
  100:10
Tyrrell's 39:7
  43:17 52:13
  55:5 65:16 70:1
  70:5 80:11
  84:17 86:2,12
  87:3 94:23
  95:11

**U**

Ultra 83:21,22
  85:6
Ultra-Vue 41:14
  41:18,23 42:2,3
  42:5,7,18 78:13
  78:15 87:24
  88:2,6,20 91:3,4
  91:8,10,17,18
  91:24 92:1,5,19
uncertain 42:13
unclear 71:17
  72:12
undated 96:5
under 6:4 21:1
  104:16
underneath 62:5
understand 5:8,11
  5:18 30:5 72:5
  73:24 89:18
understanding
  70:1
understood 5:22
undertook 77:18
undeterminable
  28:20

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries. Inc., d/b/a Iron Duck

**unique** 15:15 26:2
  36:21 38:23
  39:21,23 43:7
  49:14
**uniqueness** 39:22
**unison** 89:7
**unitary** 70:2,10
**United** 1:1 65:22
**unless** 24:20 99:19
**unsigned** 96:4
**until** 4:12 5:10
  31:2 80:5 84:6
**updated** 59:2
**upright** 62:9
**upset** 56:16
**use** 56:21 60:16
  66:8,11 68:5
**used** 7:3 46:22
  58:14 60:8
  87:15 93:5
**useful** 24:21
**user** 85:20
**users** 55:16 58:7
  59:24
**uses** 21:5
**using** 70:6
**Usually** 43:6
**utilitarian** 40:6
**utilize** 87:16
**U.S** 61:2 99:2

—————
**V**
**various** 10:9
  14:11,14,15
  19:22 33:12,14
  40:11 41:20
  58:22 59:20
  60:12 91:6
  92:21
**vehicle** 61:24
  62:11
**Velcro** 33:7,9
  78:20 87:10
  92:2 95:5
**venture** 24:18
**verbal** 73:12,13
**Verbatim** 1:18
  104:2
**Vernanico** 16:23

**version** 68:8 78:20
  87:10 88:5
**very** 24:17 29:2
  50:24 55:9
  56:18,24 77:9
**vest** 62:3
**Veterans** 37:14
**veterinarians**
  26:10
**via** 60:6 99:1
**viable** 55:6 70:13
  70:18
**vice** 7:17 8:2 9:19
  21:22 63:23
  64:1
**victim** 40:13
**view** 55:5
**violate** 83:19
**violated** 84:17
**violating** 78:4
**volume** 10:1,5,9
  29:4,15 30:20
  48:14 59:3
  105:16,21
**volumes** 10:6
**voluntarily** 21:20
**vomit** 69:13
**vomitus** 69:5,18
**vs** 1:7 106:3

—————
**W**
**wait** 5:10
**waived** 4:8
**walk** 50:11,11
**Wallace** 2:13
**Walsh** 18:16
**want** 27:21 30:5
  31:2 39:9 49:19
  69:6,11,14 90:1
  99:15,19 100:21
**wanted** 74:12
  86:18
**Washington** 29:1
**wasn't** 23:17
  39:15 42:24
  46:5 55:13
  94:14
**way** 40:14 85:4
  87:5

**ways** 12:20
**web** 59:6 79:4,10
**website** 58:16,21
  79:19,22,23
  80:4,11,14,21
  80:23 81:23
  82:1 87:5,7
**websites** 91:5
**week** 51:7,8
**weekend** 11:13
**weight** 85:11
  86:16
**Weiner** 2:4 3:5
  5:1,4 18:6,7
  22:2 23:11,19
  23:20 27:23
  28:2,6 30:22
  31:14 34:22
  50:13 53:21
  56:2,13 64:20
  65:1,5 71:12,18
  72:15,20 75:4
  75:11,19 76:6
  76:18 77:2,3
  81:6,10 82:6,11
  82:13 83:10,14
  86:4,9,14,21,24
  87:19,22 88:15
  88:18 90:17,23
  91:19,23 92:13
  92:16 93:8,11
  94:18 95:12,15
  95:19,22 96:4
  96:12,24 97:20
  97:23 98:5,10
  98:13 99:3,7,14
  100:1,23 101:3
  101:4 102:2,19
  105:11
**well** 9:4 34:24
  43:9 49:20 53:3
  57:6 85:21 90:6
**were** 3:19 8:8,12
  16:13,17 26:15
  27:2 32:5,8,10
  32:12,14 35:10
  36:7,11 38:11
  38:22 39:20
  40:2 44:17

  48:13,16 49:20
  50:1 53:16
  54:13 55:14
  61:24 63:18
  67:11 68:3
  69:19 74:15
  75:16,24 76:10
  80:8,10 84:19
  84:22 85:4,14
  85:15,18 86:1,4
  86:14,16 94:11
  98:17 103:10
**we'll** 23:2 52:14
  59:21,22 60:3
**we're** 13:9 27:21
  29:24 31:9
  45:21 49:21
  60:12 61:10
  62:14 76:7,22
  91:23 102:17
**we've** 11:24 22:6
  23:7 30:21 41:8
  41:8,12 56:23
  57:17 78:15
  90:6
**while** 69:2 94:11
**whole** 37:23 55:4
**wide** 41:12 88:4
  91:11 92:19
**wider** 42:5
**width** 91:10 92:4
**wife** 45:22
**willing** 48:15
  55:14
**wire** 21:5
**wishes** 73:20
**wishful** 30:6
**witness** 1:14 3:3
  50:9 53:17 56:7
  71:9,13 75:9
  90:1 103:8
  104:18
**wood** 20:3
**word** 75:21 94:4
**words** 59:10
**work** 8:16 9:13
  14:20 25:10
  26:7 45:24 46:1
  60:11 61:7

**worked** 7:14
  17:12,18,22
**working** 52:23
**world** 8:19 54:22
**worldwide** 74:20
**worse** 28:3
**wouldn't** 49:18
  69:6
**writing** 31:2
**written** 21:18 22:1
  23:4 73:15,16
**wrote** 99:12

—————
**X**
**X** 1:5,10

—————
**Y**
**Yeah** 28:4
**year** 8:1 11:10,10
  11:21 12:2,4,6,7
  18:1 24:9 30:17
  50:19 73:3 80:5
  98:3
**years** 7:6,15 8:3,9
  12:1 54:15
  55:12 58:23
  65:14 78:21
  85:7 92:8,11
  94:8
**year's** 97:11
**yesterday** 54:15

—————
**$**
**$400** 47:15

—————
**0**
**01144** 2:15
**02** 83:2 85:2
**02903** 2:8
**03** 81:18
**03-13** 104:10
**04** 57:17,19
**05-30172-MAP**
  1:7

—————
**1**
**1** 3:9 65:2,6 66:19
  83:21 103:10
**10** 3:14,16 24:19

Brooke Lawrence 3-30-2006
Tyrnel Enterprises, Inc. v. Fleming Industries, Inc., d/b/a Iron Duck

92:17 98:6,11
  104:23
**10th** 98:20
**10:06** 1:22 104:7
**105** 106:7
**11** 3:14 93:12
**12** 3:15 94:19,22
  95:4
**12-11-03** 82:8
**12-27-03** 82:24
**12:44** 103:9
**13** 3:15
**1365** 1:20
**14** 3:11,16 83:13
  83:15 97:18,20
**15** 3:16 7:6 98:14
**16** 3:17,17 88:4
  91:11 99:6,7
**16th** 100:7
**16-inch** 92:19
**17** 3:17 100:3
  103:10
**18** 25:15 41:14,17
  41:18,23 42:5
  42:18 88:6 91:3
  91:17 92:1
**18-inch** 41:12
  91:12
**1900** 2:14
**1973** 37:10
**1976** 7:2
**1991** 16:7,12 18:2
**1997** 16:11,12

_____
**2**
**2** 3:9 61:18 72:21
  83:24
**20** 37:14
**200** 8:20
**2000** 32:3 33:16
  33:20 34:1 41:5
  41:11 42:11
  50:18 63:19
  68:1 73:4 80:4
  84:23 85:5 88:8
  88:22
**2002** 78:12 82:16
**2003** 82:3,5 96:24
  97:7,12

**2004** 3:11,16,16
  3:17 55:10
  65:12 83:15
  96:11 97:21,23
  98:6,12,20 99:6
**2005** 83:13
**2006** 1:22 104:6
  106:5,20
**2011** 104:23
**24** 25:20 41:17
**29** 37:10 73:5
**29th** 50:17

_____
**3**
**3** 3:10 77:3 80:19
  82:14 84:4
**30** 1:22 3:16 4:4
  97:21
**30th** 104:6
**30(b)** 23:3
**30(b)6** 21:19
  22:21 23:2
  96:11 102:20
  106:5
**302** 2:7
**321** 2:7
**34** 71:2 72:11,13

_____
**4**
**4** 3:11 71:2,21,24
  82:7,9,22
**4-21-03** 3:11 81:8
  82:10
**4/16/04** 3:17
  100:12
**40** 31:18,23 61:16
**401)351-8200** 2:9
**413)733-3111**
  2:16
**455** 104:10

_____
**5**
**5** 3:5,11 70:20
  83:14
**52** 66:4

_____
**6**
**6** 3:12 87:1
**6,435,188** 65:23

**60** 31:18,23 61:16
  70:21 72:8
**62** 70:21
**63** 3:9

_____
**7·**
**7** 3:12 87:23
**70** 19:22 70:24
**71** 3:10
**72** 70:24
**75** 3:10
**79** 3:11

_____
**8**
**8** 3:13 61:17 88:19
**80** 19:22
**81** 3:11
**85** 3:12
**86** 3:12,13
**89** 3:13

_____
**9**
**9** 3:13 90:23 91:21
  92:1 93:13
**90** 3:14
**91** 3:14
**911** 55:5,7
**92** 3:15
**93** 3:15
**94** 3:16
**96** 3:16
**97** 3:17
**98** 3:17

3/30/06
EX2

# Confidential Disclosure Agreement

*Brooke Lawrence* (hereinafter referred to as DISCLOSEE), a corporation or company of the state of _nut_ with offices at _ERon Docic_ , is willing to accept a disclosure from: *Marty Tyrrell* (hereinafter referred to as DISCLOSER), relating to: *Patient Immobilization System*

DISCLOSEE will hold the novel aspects of DISCLOSER's disclosure in confidence for a period of three years from the date of receipt. The novel aspects of DISCLOSER's disclosure are those which:

1. Are not already known to DISCLOSEE from their own research or from a third party who has a right to disclose the information to DISCLOSEE; or:

2. Are not or do not become the subject of a patent issued to a third party; or:

3. Are not or do not become open to the public by any means including disclosure in patents or publications, or public use or sales.

DISCLOSEE agrees to review the disclosure and notify DISCLOSER within ten days if DISCLOSEE wishes to obtain an interest in, or provide services for, the subject matter of the disclosure.

DISCLOSEE and DISCLOSER have no further obligations with respect to the disclosure.

Sign _____ (disclosee) Date: _5 MAR00_

Sign _____ (discloser) Date: _3 29.00_

| Subj: | **RE: Ultra Vue Backboard/Head Loc-Quick Clip/Head Loc-Velcro** |
|---|---|
| Date: | 10/21/2002 4:43:09 PM Eastern Standard Time |
| From: | brooke@ironduck.com |
| To: | Kmtyrr@aol.com |
| Sent from the Internet (Details) | |

3/30/06
EX. 3

Martin,

Please contact me toll free at 800.669.6900 x 107 so that we can resolve this situation. Thank you for your time and consideration.

Brooke A. Lawrence

-----Original Message-----
**From:** Kmtyrr@aol.com [mailto:Kmtyrr@aol.com]
**Sent:** Saturday, October 19, 2002 3:08 PM
**To:** idinfo@ironduck.com
**Subject:** Ultra Vue Backboard/Head Loc-Quick Clip/Head Loc-Velcro

My name is Martin Tyrrell. I brought a design for a new head immobilization system to a man named Brooke who appeared to like the design. At the time he signed a nondisclosure agreement and promised to get back to me. After that time I have been unable to contact anybody. It is in the best interest of Fleming Industries to know that the Ultra Vue Backboard, the Disposable Head Loc-Velcro, and the Disposable Head Loc-quick clip are all being marketed in violation of my patent as granted by the U.S. Patent and Trademark Office. I can be contacted at (508) 378-3247. My address is 841 Crescent St. East Bridgewater, MA 02333-1609. In the meantime I will be contacting my attorney concerning patent infringement.

Sunday, December 22, 2002 America Online: Kmtyrr

EX 12
3/30/06



